UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COURT COPY

-------------------------------------------------------------------------X

WILLIAM  MURAWSKI aka and better known as
BILL MURAWSKI and all other candidates who are
similarly situated as the Plaintiff(s).

**AFFIDAVIT IN SUPPORT**

**DOCKET# 17 CV _____**

v.

NEW YORK STATE BOARD OF ELECTIONS, NEW
YORK CITY BOARD OF ELECTIONS and the NEW
YORK CITY CAMPAIGN FINANCE BOARD as the
Defendants.

-------------------------------------------------------------------------X

1.  I am WILLIAM MURAWSKI aka and better known as BILL MURAWSKI  (hereinafter referred to as MURAWSKI) in business and with family, friends, associates and colleagues hereby submits this sworn affidavit in support of the above captioned Complaint.

2.  MURAWSKI is fully familiar and understands the facts and circumstances in the above captioned Complaint for the following reasons:

    a. MURAWSKI entered and managed election campaigns for New York City Council District 3 in 1997, 1999 (a "Special Election") and for city council in 2005;

    b. MURAWSKI entered and managed an election campaign for the United States Senate representing the State of New York in 1999;

    c. MURAWSKI entered and managed an election campaign for the office of the Public Advocate of the City of New York in 2001;

    d. MURAWSKI entered and managed an election campaign for the Governor of the State of New York in 2008; and

e. MURAWSKI worked as a poll worker for the New York City Board of Elections in the Presidential Election of 2016.

3. MURAWSKI entered into the election for the office of the New York City Council District 3 in 1997 for the sole purpose of "testing the waters" to prepare for the 2001 primary and general election that was supposed to begin term limits in the City of New York for all elective offices in the city.

4. MURAWSKI changed his voter registration record for the 1997 city council election from no party affiliation to belonging to the Independence Party.

5. MURAWSKI was placed "on the ballot" for the 1997 election city council election as the Independence Party gathered the approximately 53 signatures that were filed with the NYCBOE.

6. MURAWSKI received approximately 8% of the vote in the city council election in 1997 and spent approximately $5000 against the then incumbent councilmember Tom Duane, who was the most well-known LGBT candidate who held an elective office.

7. MURAWSKI was surprised and shocked because Tom Duane resigned his office as city council member and a "Special Election" was called in 1999 for the city council seat vacated by Tom Duane as he was going to run for a seat in the New York Senate. Nonetheless, MURAWSKI entered into the Special Election for the office of the New York City Council District 3, hereinafter referred to as the "Special Election".

8. Still unfamiliar with the election process, and especially a Special Election, MURAWSKI waited for the Proclamation by then Mayor Rudolph Giuliani to hold the Special Election.

9. The Proclamation for the Special Election for New York City Council District 3 was made by then Mayor Giuliani on Friday December 3, 1999 (hereinafter referred to as "the

Proclamation") long after the NYCBOE closed its doors at 5 pm.  MURAWSKI was not notified of the Proclamation by the NYCBOE.

10. MURAWSKI discovered the Proclamation was made because persons were observed obtaining petitions for the four other candidates who filed for the Special Election.  Nonetheless, MURAWSKI waited until Monday morning December 6, 1999 to contact the NYCBOE to find out if indeed the Proclamation was made as MURAWSKI did not want to violate any laws.

11. MURAWSKI contacted and was informed by the NYCBOE on Monday December 6, 1999 that the Proclamation was made on Friday December 3, 1999 after hours. When MURAWSKI asked why there was not an official notification of the Proclamation as he was a candidate in the Special Election he was told:  "What did you want? A special invitation?"

12. Since there was only 13 days to gather 2,700 hundred signatures to get "on the ballot" Murawski lost 3 days to gather signatures for his petition.

13. MURAWSKI was unable to gather the number of signatures to get "on the ballot".

14. MURAWSKI questioned the "gentleman's agreement" made among the other four candidates in the Special Election not to challenge the petitions of each other, therefore MURAWSKI challenged all of the signatures on the petitions of each of the four candidates.

15. The NYCBOE reported that ALL signatures for ALL candidates were valid, which totaled more than 10,000 signatures (4 candidates X 2,700 signatures per candidate) and it created questions for MURAWSKI regarding the petitioning process.

16. After a thorough review of all documents relevant to the Special Election, MURAWSKI decided to continue to research the management of the election process.

17. MURAWSKI began research by reviewing the election results for the 2000 Presidential Election and it was discovered "write-in" votes were not counted AND the total votes did not match the public counter for all candidates. The Court is respectfully referred to Exhibit B, which is a copy of the recanvassing of the 2000 Presidential Election that was downloaded from the NYCBOE.

18. MURAWSKI was a successful problem solver for leading edge technology companies for 28 years who solved problems with electro-mechanical machinery; refrigeration systems; hydraulic disk files; and was educated in basic electronics that included but not limited to discreet components such as capacitors, resistors and transistors. The Court is referred to Exhibit C, which is a copy of the resume of MURAWSKI.

19. MURAWSKI is a Constitutionalist and as such decided to use the business acumen and experience obtained as a successful problem solver working for leading edge technology companies to repair the election process in New York State. MURAWSKI also has 4 Purple Hearts and a Bronze Star in his family from WWII and as such, respects and honors the services of all members of the Armed Forces of the United States and does so by protecting and defending the Constitution.

20. Because there was no type of audit trail with the mechanical voting machines used in the State of New York at the time, and it was discovered the NYCBOE was not recording "write-in" votes, MURAWSKI decided to first address the issue of "write-in" votes not being counted.

21. As an observer of the recanvassing of votes in the 2001 city-wide election, MURAWSKI discovered "write-in" votes were not counted during the recanvassing process. Further on in the investigative research process, MURAWSKI discovered that the NYCBOE was also not educating poll workers on how to record a "write-in" vote on the mechanical voting machines.

22. As a result of intensive research on outcome of the 2001 city-wide elections, MURAWSKI wrote an analysis report on the 2001 city-wide elections in New York City that provided further information on the quest to repair the election process in New York State. The Court is respectfully referred to Exhibit D, which is a copy of the analysis report developed by MURAWSKI for the 2001 city-wide elections in New York City.

23. To gather additional information regarding the election process in New York State for the purpose of repairing it, MURAWSKI decided to take a "hands-on" approach and entered into as many elections as possible.

24. Because the 2000 Presidential Election in Florida resulted in the passing of the Help America Act ("HAVA"), which replaced all mechanical voting machines in America with either optical scanners and paper ballots, Digital Voting Recorders ("DRE's) or a combination of the two technologies, MURAWSKI decided to "push" the State of New York into selecting optical scanners and paper ballots for its recording of votes because DRE's could be easily hacked into to change votes based upon MURAWSKI'S experience as a software developer.

25. Each and every election that MURAWSKI entered with the exception of one, the intention was not to submit the valid number of signatures to get "on the ballot" but to submit a minimal number of signatures to manage a write-in campaign.

26. In each and every election MURAWSKI entered where the number of signatures that were required to get "on the ballot", the signature requirements were intentionally not met. Further, the following information was written on the Cover Sheet for the petition volume when submitting the petitions to the NYCBOE: Alan Keyes was placed on the ballot in the 2000 Presidential Election without submitting any signatures as a result of Molinari v. Powers, 82 F. Supp. 2d 57 (E.D.N.Y. 2000), which set a precedent in New York State. Since MURAWSKI submitted more signatures than Alan Keyes, MURAWSKI should be placed "on the ballot".

### REASONS FOR GERRYMANDERING OF CITY COUNCIL DISTRICT

27.  The following paragraphs will present the basis and foundation for gerrymandering City Council District 3 against MURAWSKI.

28. During 1995 MURAWSKI opposed the immoral and illegal privatization of DeWitt Clinton Park located in Hell's Kitchen between 11th and 12th Avenues and between 52nd and 54th Street ("the Park").

29. MURAWSKI attended public hearings, community meetings, and full-board meetings held by held by Manhattan Community Board 4 ("CB4"), it was approved on the second vote at a second full board meeting to move ahead with the privatization efforts of the Park.

30.   Thereafter, MURAWSKI attended a public hearing by the New York City Franchise, Concessions and Review Board regarding the privatization effort of the Park. The result was a 6 to 0 vote in favor of the privatization by Pomp Duck and Circumstance ("PDC"), which was a German-based dinner theater show.  A final hearing was held at city hall shortly thereafter and the privatization of the Park was approved to move forward.

31. MURAWSKI sued Henry Stern as the Commissioner New York City Parks of Department; CB4; and PDC in New York State Supreme Court in an effort to stop the privatization, which was the test case by the Giuliani administration to privatize all city parks and as such, the issue of the privatization became an pressing issue for the public, which garnered a great deal of interest by the media.

32. Two articles were published in the Village Voice, a two page article was published in the New York Times Sunday Edition, and as the date of the hearing came closer, the New York Post and the Daily News also published articles regarding the privatization of the Park by PDC.  NBC Channel 4 News also featured a 2 to 3 minute segment on the issue prior to the hearing.

33.  A hearing was held on October 2, 1995 at the New York State Supreme Court regarding the privatization.  Since the hearing was scheduled on the same day it was announced that a verdict was to forthcoming the following day in the O.J. Simpson case, the only persons in the court room were the defendants and their attorneys, me and my attorney and the judge.  Because there was no media anywhere to be found, the case was able to be "swept under the rug" and was wrongfully dismissed.

34.  Although the facts of the case clearly demonstrated fraud by CB4 and the city, and the co-owner of PDC was a known international criminal (Dieter Esch) who was blamed for the largest banking failure in German history at the time; a Saudi investor was defrauded out of $50 million dollars; and because of the involvement of IBH (a company owned by Dieter Esch in Germany) with General Motors, General Motors had to pay German creditors $43 million dollars to stop the extradition of General Motors Chairman Roger Smith to Germany on charges of fraud.

35.  Tom Duane was the councilmember for New York City Council District 3 where the Park is located and Christine Quinn was Duane's Chief of Staff at the time of the privatization of the Park.   Members of CB4 were known to be packed by supporters of Tom Duane.

36.  MURAWSKI visited the New York State Supreme Court a few years ago to review the matter of the privatization of the Park to review the case file (Index Number 0122487/1995) and found all exhibits documenting the corruption of CB4 and the city to be missing from the case file.

37.  Because MURAWSKI ran for the office of City Council representing District 3 in 1997 and 1999, and because it was made known that MURAWSKI would run for the office again, City Council District 3 was gerrymandered against him.   The Court is respectfully referred to Exhibit E, which are copies of the maps for New York City Council District 3 prior to the gerrymandering and after it.

38.  The northern end of City Council District 3 was gerrymandered against MURAWSKI to prevent him from obtaining votes and signatures in the next primary and general election that was planned against incumbent Christine Quinn.  The Court is again respectfully referred to Exhibit E because each image has a paragraph that explains the reasons why.

## REMNANTS OF THE PARK BATTLE CONTINUE TO PLAGUE MURAWSKI

39.  New York State Senator Franz Leichter surprisingly supported the privatization of the Park.  In fact, Senator Leichter co-sponsored the Hudson River Park Bill, of which the plans by the Hudson River Park Trust ("HRPT") included connecting the Park to the Hudson River Park in a manner that is unknown to MURAWSKI.

40.  Senator Franz Leichter was appointed to the board of directors of the HRPT after vacating his Senate seat.  Attorney Eric Schneiderman ran for the senate seat vacated by Franz Leichter and became a New York State Senator representing the senate district in which MURAWSKI lived.  Schneiderman is now the New York State Attorney General.

41.  Since MURAWSKI was unable to obtain signatures for the 2005 election for city council as the support base vanished due to the gerrymandering of City Council District 3, signatures had to be obtained elsewhere.  The Hudson River Park was the perfect venue to obtain signatures because it had a captured audience with visitors at the park

42. During the petitioning process with two supporters of MURAWSKI at the Hudson River Park, members of the Parks Enforcement Police ("PEP") threatened to arrest MURAWSKI and his supporters if they did not stop petitioning at the park.  Tempers flared when PEP informed the petitioners that it is the law of the HRPT that a permit is necessary to petition at the park.

43.  MURAWSKI calmed his supporters and agreed to obtain a permit to collect over 2700 signatures, which was a futile and failed effort.

44. In MURAWSKI'S quest to repair the election process in New York State, and because there was an upcoming primary election for the office of city council for City Council District 3, and because MURAWSKI never intended to "get on the ballot", the decision was made to obtain a a few more than enough signatures to get on the ballot as the next step in MURAWSKI'S research was to find out how the board of elections would throw him off the ballot, which it did.

45.   Thoroughly familiar with the petitioning process, MURAWSKI knew how to record valid signatures that that would be challenged and declared void. Knowing computer databases as MURAWSKI does, he was confident that he could overcome the challenges. NOT!

46.   MURAWSKI was sued in New York State Court for the signature/petition and upon arrival at the court MURAWSKI was informed to go to another room outside of the court room and to see a court representative believed to be an administrative judge of some sort.  MURAWSKI was accompanied with one of the top election lawyers in America who would be the opposing counsel for the two plaintiffs who, based upon information and belief, belonged to the Democratic Political Club in which Councilmember Christine was a member.

47.   MURAWSKI was "knocked off the ballot" as the administrative judge would not listen to MURAWSKI's sound argument that there was no way that the signatures challenged could be proven as valid as there was not a copy of the voter registration database saved at the time the signatures were submitted to the New York City Board of Elections as ANYONE could have deleted the voter registration records of those who signed the petition.

48.   At the time of the general election in 2005 the New York City Campaign Finance Board published its Voter Guide showing that MURAWSKI was "on the ballot" for the primary election.

49.  On the day of the primary election, MURAWSKI received a call from a voter stating that she wanted to vote for me but my name was not on the ballot and the poll workers were unaware of how she could vote for me.

50.  The voter was informed by MURAWSKI how to perform a write-in ballot. Whether or not the voter voted for MURAWSKI is unknown.

51.  MURAWSKI received 3 write-in votes for the election.

### THE SIGNATURE SCHEME IS ARBITRARY AND CAPRICIOUS

52.  There is no logical reason that can be found as how the signature scheme was developed by the New York State Board of Elections.

53.  The signature requirements for candidates belonging to constituted parties in the state is 5% of the registered voters in the party for city council members or 900 signatures, whichever is less.  The "rule of thumb" for collecting the number of signatures is three times the number of signatures required to ensure that a candidate is not "knocked off the ballot".

54.  The entirety of the ballot access process and voting requirements in New York State are based upon signatures.  Employees of the New York State and New York City Board of Elections do not have the number of employees necessary who are handwriting experts, if there are any, to perform as poll workers to verify the signatures of voters when they come to the voting polls to vote, nor are there the number of employees necessary, if any, who are handwriting experts who can validate signatures that are placed upon petitions

55.  MURAWSKI met with a handwriting expert a few years ago and the only way a signature can be verified as "real" is to have the original signature at hand to compare with the signature that is written.  And yet further, as persons age and change in appearance, the handwriting of persons also change.

56.   Although MURAWSKI is "expert" at collecting signatures for petitions, initial attempts at obtaining signatures for the Democratic Primary that is to be held on September 12, 2017 were futile therefore petitioning kits were handed out to 34 friends and neighbors of MURAWSKI, who also found collecting signatures to be futile as people came up with all sorts of reasons not to sign a petition  Some of the reasons for not signing a petition this year were; "I am not a registered voter"; I don't live in the city;  I am not a registered Democrat;  I don't want the government to have any information about me; I don't want my identity stolen etc etc."

57.   The best reason MURAWSKI heard for not signing a petition was that "Since Hillary Clinton lost to Donald Trump and was voted in as President of the United States, I don't want to have anything to do with elections anymore because they are fixed!"

58.   Further complicating the issue of collecting signatures for petitions is the time of year as petitioning began during the time people go on vacations, move because their children graduate and the brutal hot, humid and rainy weather that was experienced this year and every year, limited the amount of time a person can be outside attempting to collect signatures.

59.   The signature requirements for petitioning in New York State is arbitrary and capricious and therefore is unconstitutional.

**SCHEDULING OF PRIMARY ELECTIONS VIOLATES EQUAL PROTECTION CLAUSE**

60.   In 2016, Congressional Primary Elections were held on June 28, 2016, which gave Congressional candidates 144 days to campaign for the general election on November 8, 2016; the Presidential Primary Election was held on April 19, 2016, which gave Presidential candidates 203 days to campaign for the general election on November 8, 2016;  State and Local election Primaries were held on  September 13, 2016, which gave state and local candidates 57 days to campaign for the general election on November 8, 2016.

61. The scheduling of Primary Elections in the State of New York violates the Equal Protection Clause of the 14th Amendment to the Constitution.

## THE ELECTION LAW VIOLATES THE 1ST AND 14TH AMENDMENT

62. According to information obtained from the website of the New York State Board of Elections, as of April 1, 2017 there are 2,395,338 persons who are registered voters throughout the state and there are 780,220 throughout the City of New York who are not registered with any constituted political party, therefore they cannot vote in primary elections.

63. Candidates who win an election primary are those who win races in the general election and yet, a total of 2,395,338 voters registered in the State of New York and 780,220 voters registered in the City of New York cannot vote for any candidate in a primary election.

64. The Election Law in New York State violates the free speech clause of the 1st Amendment and the Equal Protection Clause of the 14th Amendment to the Constitution of the United States of America of voters registered in the State of New York and the City of New York who do not belong to any constituted political parties because they cannot vote in primary elections.

## NEW YORK STATE IS AN OLIGARCHY

65. An oligarchy is defined in Black's Law Dictionary as a form of government wherein the administration of affairs is lodged in the hands of a few persons.

66. Elections in New York State are controlled solely by the New York State and New York City Boards of Election.

67. The voting statistics in the following 2 paragraphs are obtained from the website of the New York State Board of Elections.

68.  Bill de Blasio won the 2013 election for mayor with 18.5% of voters registered in the city voting for him; Michael Bloomberg won the 2009 election for mayor with by 14% of the registered voters in the city voting for him; and Michael Bloomberg won the 2005 election for mayor with 17% of registered voters in the city voting for him.

69.  Andrew Cuomo won the 2014 election for governor with 18% of voters registered in the state voting for him; Andrew won the 2010 election for governor with 27% of voters registered in the state voting for him; and Eliot Spitzer won the 2006 election for governor with 25% of voters registered in the state voting for him.

70.  Although the voting statistics in the above 2 paragraphs are not based upon a "few persons", the New York State and New York City Boards of Election are considered a "few persons" compared to the 12 million persons living in the State of New York and 8 million persons living in New York City.

69.  New York State is an Oligarchy.

70.  After MURAWSKI submitted the petitions for the Democratic Primary that is to be held, MURAWSKI expected to appear in front of the New York City Board of Elect ions to argue why his name should be on the ballot and as such, MURAWSKI attended the first day of hearings that was to address issues with city-wide candidates.

71.  When MURAWSKI arrived and looked at the schedule he was not scheduled to appear.  MURAWSKI then asked a worker from the Candidates Record Unit ("CRU") to find out if MUJRAWSKI was "knocked off the ballot" or not.   The worker went to the CRU in another building and when he came back, the answer was that MURAWSKI was "knocked off the ballot" but did not return with evidence of the fact.

72.  For the next 3 days MURAWSKI attempted to obtain evidence from the New York City Board of Elections to the fact that he was knocked off the ballot, to no avail. It was not until August 9, 2017 that Murawski was able to obtain the factual evidence that he

was "knocked off the ballot". The Court is respectively referred to Exhibit F, which contains a copy of a memo from the New York City Board of Elections.

73.    It took 9 days for MURAWSKI to obtain the memo that indicated he was officially "knocked off the ballot"

74. The NYCBOE violated MURAWSKI'S 5th and 14th Amendment protection of Due Process protected by the Constitution during the ballot access portion for attaining ballot access for the Democratic Primary that is planned to be held on September 12, 2017.

75. Had MURAWSKI received the memo in the mail shortly after the date it was it was time stamped (July 27, 2017) like all other previous communiques from the Board of Elections was received, this Complaint would have been filed much sooner.

76. The NYCBOE violated MURAWSKI'S 1st Amendment right protected by the Constitution during the ballot access portion for attaining ballot access for the Democratic Primary that is planned to be held on September 12, 2017.

77. Although other candidates for mayor that will be "on the ballot" in the Democratic Primary on September 12, 2017, they were not able to "jump through another hoop" to be invited to the televised debates as they did not raise enough money for their campaign.

78. The New York City Campaign Finance Board violated the 1st Amendment right of free speech and the Equal Protection Clause of the 14th Amendment both of which are protected by the Constitution. Further, the voters of the City of New York will not know anything about the candidates for mayor other than those who were permitted to debate over the air waves.

79. The NYCBOE violated the Help America Vote Act ("HAVA") in the 2013 city-wide elections. The Court is respectfully referred to Exhibit G, which is an article by the New York Times that demonstrates that the New York State Legislature and Governor Cuomo

signed a one-time-use law to permit the New York City Board of Elections to use the old and not maintained to mechanical voting machines that were replaced as a result of the Help America Vote Act.

80.  The New York City Board of Elections violated the Help America Vote Act.

**81. Murawski respectfully requests the Court to grant MURAWSKI the relief stated in the Complaint. And anny other relief the Court believes id just and fair.**

**Yours truly,**

**William Murawski**

Sworn to before me
on this 3th day of September 2017

EVELYN APRIL HAMMER
Notary Public, State of New York
No. 01HA6257725
Qualified in New York County
Commission Expires ~~March 17, 2018~~

April 2, 2020