COURT COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

WILLIAM MURAWSKI aka and better known as
BILL MURAWSKI and all other candidates who
are similarly situated as the Plaintiff(s).

v.

NEW YORK STATE BOARD OF ELECTIONS,
NEW YORK CITY BOARD OF ELECTIONS and
the NEW YORK CITY CAMPAIGN FINANCE
BOARD as the Defendants.

------------------------------------------------------------X

**AMENDED COMPLAINT**

**Civil Action No: 17 CV 6859**

## I. JURISDICTION

The Federal District Court of the Southern District of New York has jurisdiction in the above captioned complaint because of violations of the 1st, 5th and 14th Amendments to the Constitution of the United States of America; 42 U.S. Code 42 § 1986; U.S. Code 42 § 1985 (3); and the Help America Vote Act (HAVA). The causes of action in the above captioned Amended Complaint are explained in MURAWSKI'S affidavit and the Exhibits included with this Amended Complaint.

## II. PARTIES

A. Plaintiff(s):

WILLIAM MURAWSKI aka and better known as BILL MURAWSKI filed with the NYCBOE as a candidate for Mayor of the City of New York in the Democratic Primary to be held on September 12, 2017 and in the General Election to be held on November 7, 2017. William MURAWSKI is a natural born citizen of the United States of America and lives at 530 West 50th Street in the Borough of Manhattan and has lived at that residence for more than thirty years. The contact telephone number for WILLIAM MURAWSKI is (917) 407-6492; email address is Information@BillMurawski.com

"Similarly situated candidates" are those persons who filed with the NYCBOE to run for city-wide and local elective offices of the City of New York and filed petitions to run in the Primary Election that were held on September 12, 2017 and who were "'knocked off the ballot" as a result of the policies, procedures and rules of the NYSBOE and the NYCBOE. Contact information is unknown.

3. Order the NYCBOE and the NYSBOE to develop a ballot access procedure such as a bond requirement that is financially reasonable for candidates to obtain ballot access that is not arbitrary and capricious.

4. Order the NYCBOE and the NYSBOE to allow those voters who are not registered in any constituted party to vote in all Primary Elections held in New York State.

5. Declare the 2013 election for mayor of the City of New York as null and void because of collusion and Constitutional violations set forth in MURAWSKI's Complaint.

6. Order the NYSBOE and the NYCBOE to have Primary Elections held in September to be held on any Tuesday in a week that is either before or after the yearly September 11th Commemoration because on September 11, 2001 both towers of the World Trade Center collapsed on the exact day that term limits were put into place for all elective offices in New York City, and as such, the healing process in New York City continues yearly every September 11th thereby distracting voters away from the Primary Elections.

7. Order the NYSBOE and the NYCBOE to schedule all primary elections for city, state and federal elections on the same day to comply with the Equal Protection Clause of the 14th Amendment to the Constitution, which is believed to also assist in saving the taxpayers approximately $9 million dollars that is spent yearly in overtime by the NYCBOE and the NYSBOE.

8. Order the NYSBOE and the NYCBOE to develop a method within a 3 year period whereby voters can obtain a paper receipt for the ballot they cast in any election held in New York State AND that the voter can verify on the internet that all votes cast on the ballot were counted.

9. Order the Board of Elections to develop a method whereby a third, non-interested party such as the League of Women Voters can verify the votes cast in any election held in New York State.

10. Any other relief the Court deems just and proper in favor of the voters of New York State.

Respectfully,

William Murawski

Sworn to before me on this 22nd day of September 2017

EVELYN APRIL HAMMER
Notary Public, State of New York
No. 01HA6257725
Qualified in New York County
Commission Expires March 18, 2018
April 20 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

WILLIAM  MURAWSKI aka and better known as
BILL MURAWSKI and all other candidates who are
similarly situated as the Plaintiff(s).

v.

NEW YORK STATE BOARD OF ELECTIONS, NEW
YORK CITY BOARD OF ELECTIONS and the NEW
YORK CITY CAMPAIGN FINANCE BOARD as the
Defendants.

-------------------------------------------------------------------------X

**Civil Action No: 17 CV 6859**

**AFFIDAVIT IN SUPPORT
OF
AMENDED COMPLAINT**

1.    WILLIAM MURAWSKI aka and better known as BILL MURAWSKI in business and with family, friends, associates and colleagues, hereinafter referred to as MURAWSKI, hereby, submits this sworn affidavit in support of the above captioned Complaint.

2.    MURAWSKI is fully familiar and understands the facts and circumstances in the above captioned Complaint for the following reasons:

a. MURAWSKI entered and managed an election campaign for New York City Council District 3, hereinafter referred to as "District 3" in 1997; for a Special Election for District 3 in 1999, hereinafter referred to as "the Special Election";  and for an election for District 3 in 2005;

b. MURAWSKI entered and managed an election campaign for the United States Senate representing the State of New York in 1999;

c. MURAWSKI entered and managed an election campaign for the office of the Public Advocate of the City of New York in 2001;

d. MURAWSKI entered and managed an election campaign for the Governor of the State of New York in 2008; and

e. MURAWSKI worked as a poll worker for the New York City Board of Elections in the Presidential Election of 2016.

3. MURAWSKI entered into the election for District 3, in 1997 for the sole purpose of "testing the waters" to prepare for the 2001 primary and general election that was supposed to begin term limits in the City of New York, hereinafter referred to as "the City", for all elective offices in the City.

4. MURAWSKI changed his voter registration record for the 1997 District 3 election from no party affiliation to registration in the Independence Party.

5. MURAWSKI was placed "on the ballot" for the 1997 District 3 election as the candidate for the Independence Party because the Independence Party gathered approximately 53 signatures that were filed with the New York City Board of Elections, hereinafter referred to as "the NYCBOE".

6. MURAWSKI received approximately 8% of the vote in the 1997 District 3 election in 1997 and spent approximately $5000 against then incumbent councilmember Tom Duane, who was the most well-known LGBT candidate who held an elective office at the time.

7. MURAWSKI was surprised and shocked because Tom Duane resigned his office as city council member and a "Special Election" was to be called in 1999 for the District 3 seat vacated by Tom Duane as he was going to run for an office in the New York Senate. Nonetheless, MURAWSKI entered into the Special Election for District 3 in 1999.

8. Still unfamiliar with the election process, and especially a "Special Election", MURAWSKI waited for the Proclamation by then Mayor Rudolph Giuliani for a date to hold the Special Election.

9. The Proclamation for the Special Election for District 3 was made by then Mayor Giuliani on Friday December 3, 1999, hereinafter referred to as "the Proclamation", long after the NYCBOE closed its doors at 5 pm.  MURAWSKI was not notified of the Proclamation by the NYCBOE.

10. MURAWSKI discovered the Proclamation was made because persons were observed obtaining petitions for the other four other candidates who filed for the Special Election. Nevertheless, MURAWSKI waited until Monday morning December 6, 1999 to contact the NYCBOE to find out if indeed the Proclamation was made as MURAWSKI did not want to violate any laws.

11. MURAWSKI was informed on Monday December 6, 1999 by the NYCBOE that the Proclamation was made on Friday after hours. When MURAWSKI asked why there was not an official notification of the Proclamation sent to him to him because he was a candidate in the Special Election, MURAWSLKI was told: "What did you want? A special invitation?"

12. Since there were only 13 days to gather 2,700 hundred signatures to get "on the ballot", Murawski lost 3 days to gather signatures for his petition for the Special Election.

13. MURAWSKI was unable to gather the number of signatures to get "on the ballot" for the Special Election.

14. MURAWSKI questioned the "gentleman's agreement" that was made among the other four candidates in the Special Election not to challenge the petitions of each other, therefore MURAWSKI challenged all of the signatures on the petitions of each of the four candidates.

15. The NYCBOE reported that ALL signatures for ALL candidates were valid that were submitted to the NYCBOE for the Special Election, which totaled more than 10,000 signatures (4 candidates X 2,700 signatures per candidate) and it therefore created questions for MURAWSKI regarding the petitioning process using and verifying signatures for a candidate to be placed "on the ballot".

16. After a thorough review of all documents relevant to the Special Election, MURAWSKI decided to research the management of the election process by the NYCBOE as it pertains to verifying signatures on a petition to be placed on the ballot.

17. MURAWSKI began research by reviewing the election results for the 2000 Presidential Election in New York State and it was discovered "write-in" votes were not counted AND the total votes did not match the public counter for all candidates. The Court is respectfully referred to Exhibit 1, which is a copy of the recanvassing of the 2000 Presidential Election that was downloaded from the website of the New York State Board of Elections, hereinafter referred to as "the NYSBOE".

17. MURAWSKI was a successful problem solver for leading edge technology companies for 28 years who solved problems scientific mainframe computers; electro-mechanical machinery, some containing thousands of moving parts; refrigeration systems that cooled the scientific mainframe computers; hydraulic disk files that stored information; and was educated in basic electronics that included but was not limited to discreet components such as capacitors, resistors and transistors. The Court is referred to Exhibit 2, which is a copy of the resume of MURAWSKI.

18. MURAWSKI is a Constitutionalist and as such decided to use the business acumen and experience obtained as a successful problem solver working for leading edge technology companies for 28 years to repair the election process in New York State.

19. Because there was no type of audit trail with the mechanical voting machines used in the State of New York in 2000, and it was discovered the NYCBOE was not recording "write-in" votes, MURAWSKI decided to first address the issue of "write-in" votes not being counted by the NYCBOE.

20. As an observer of the recanvassing of votes in the 2001 city-wide election, MURAWSKI discovered "write-in" votes were not counted during the recanvassing process. Further on in the investigative research process, MURAWSKI discovered that the NYCBOE was also not educating poll workers on how to record a "write-in" vote on the mechanical voting machines.

21. As a result of intensive research on the 2001 city-wide elections, MURAWSKI authored an analysis report on the 2001 city-wide elections in New York City, hereinafter referred to as the "the Election Report", which provided further information for Murawski to

repair the election process in New York State. The Court is respectfully referred to Exhibit 3, which is a copy of the analysis report developed by MURAWSKI for the 2001 city-wide elections in New York City.

22. The Election Report demonstrates the following:

a. 2.6% of the persons who voted in the 2001 election for mayor either did not have their votes counted or did not vote for a mayoral candidate;

b. 39.6% of the persons who voted in the 2001 election either did not have their votes counted or did not vote for a candidate for public advocate;

c. 42.5% of the persons who voted  in the 2001 election either did not have their votes counted or did not vote for a candidate for comptroller;

d. 24.2% of the persons who voted in the 2001 election either did not have their votes counted or did not vote for a candidate for borough president;

e. 25.8% of the persons who voted in the 2001 election either did not have their votes counted or did not vote for a candidate for city council; and

f. 9% of the total population of the city of New York elected the Mayor.

23. To gather additional information regarding the election process in New York State for the purpose of repairing it, MURAWSKI decided to take a "hands-on" approach and entered into as many elections as possible.

24. Because the 2000 Presidential Election in Florida  resulted in the passing of the Help America Act ("HAVA"), which replaced all mechanical voting machines in America with either optical scanners with paper ballots, Digital Voting Recorders, hereinafter referred to as "DRE's" or a combination of the two technologies, MURAWSKI decided to "push" the State of New York into selecting optical scanners and paper ballots for its recording.

25. MURAWSKI'S decision to choose optical scanners and paper ballots over DRE's is based upon MURAWSKI'S experience as a software developer.

Christine Quinn was Duane's Chief of Staff at the time of the privatization of the Park by PDC. Members of CB4 were known to be packed by supporters of Tom Duane.

40.   MURAWSKI visited the New York State Supreme Court a few years ago to review the case file (Index Number 0122487/1995) regarding the privatization of the Park by PDC and found all exhibits documenting the corruption of CB4 and the city to be missing from the case file.

41.   Because MURAWSKI ran for the office of City Council representing District 3 in 1997 and 1999, and because it was made known that MURAWSKI would run for the office again, District 3 was gerrymandered against him.   The Court is respectfully referred to Exhibit 4, which are copies of the maps for District 3 prior to the gerrymandering and after it.

42.   The northern end of District 3 was gerrymandered against MURAWSKI to prevent him from obtaining votes and signatures in the next primary and general election that was planned against incumbent Christine Quinn in 2005.   The Court is again respectfully referred to Exhibit 4  upon each image that explains the reasons why.

**REMNANTS OF THE PARK BATTLE CONTINUE TO PLAGUE MURAWSKI**

43.   New York State Senator Franz Leichter surprisingly supported the privatization of the Park by PDC in 1995.   In fact, Senator Leichter co-sponsored the Hudson River Park Bill, of which the plans by the Hudson River Park Trust ("HRPT") included connecting the Park to the Hudson River Park in a manner that is unknown to MURAWSKI.

44.   Senator Franz Leichter was appointed to the board of directors of the HRPT. Attorney Eric Schneiderman ran for the New York Senate office vacated by Franz Leichter and became a New York State Senator representing the senate district in which MURAWSKI lived.  Schneiderman is now the New York State Attorney General.

45.   Since MURAWSKI was unable to obtain signatures for the 2005 election for city council as the support base vanished due to the gerrymandering of City Council District 3,

signatures had to be obtained elsewhere. The Hudson River Park was the perfect venue to obtain signatures because it had a captured audience with visitors at the park

46. During the petitioning process with two supporters of MURAWSKI at the Hudson River Park, members of the Hudson River Park's Enforcement Police, hereinafter referred to as "PEP" threatened to arrest MURAWSKI and his supporters if they did not stop obtaining petitions at the park.

47. Tempers flared when PEP informed MURAWSKI and his supporters that it is the law of the HRPT that a permit is necessary to petition at the park.

48. MURAWSKI calmed his supporters and grudgingly agreed to obtain a permit to collect signatures for an election for District 3 in 2005. The Court is respectfully referred to Exhibit 5, which is a copy of the Villager newspaper that was downloaded from its website demonstrating that MURAWSKI had to obtain a permit to obtain signatures at the Hudson River Park.

49. In MURAWSKI'S quest to repair the election process in New York State, and because there was a primary election for District 3, and because MURAWSKI never intended to "get on the ballot", the decision was made to obtain a few more than enough of the 900 signatures necessary to "get on the ballot" as the next step in MURAWSKI'S research was to find out how he would be thrown "off the ballot", which happened.

50. Thoroughly familiar with the petitioning process, MURAWSKI knew just how to record valid signatures that that would be challenged and declared void. Knowing computer databases as MURAWSKI does as a result of his experience as a problem solver for leading edge technology companies, he was confident that he could overcome the signature challenges.

51. MURAWSKI was sued in New York State Court for a challenge on the validity of the signatures on the signatures on the petition challenge. Upon arrival at the court MURAWSKI was informed to go to another room outside of the court room and to meet with a court representative believed to be an administrative judge of some type.

52.   MURAWSKI accompanied one of the top election lawyers in America who would be the opposing counsel for the two plaintiffs who, based upon information and belief, belonged to the Democratic Political Club in which Councilmember Christine was a member.

53.   MURAWSKI was "knocked off the ballot" as the administrative judge would not listen to MURAWSKI's sound argument that it was impossible to prove that the signatures challenged could be proven as valid as there was not a copy of the voter registration database saved at the time the signatures were submitted to the NYCBOE as ANYONE could have deleted the voter registration records of those persons who signed the petition.

54.   At the time of the primary election in 2005 the New York City CampaignFinance Board, hereinafter referred to as the "FINANCE BOARD" published its Voter Guide showing that MURAWSKI was "on the ballot" for the election.

55.   On the day of the election, MURAWSKI received a call from a voter stating that she wanted to vote for me but my name was not on the ballot and the poll workers were unaware of how to have a voter write-in the name of a candidate.

56.   The voter was informed by MURAWSKI how to perform a write-in ballot. Whether or not the voter voted for MURAWSKI is unknown.

## THE SIGNATURE SCHEME IS ARBITRARY AND CAPRICIOUS

57.   Based upon information and belief, a logical or scientific method as to how the signature scheme developed by the NYSBOE for a person to be placed "on the ballot" could not be found.

58.   The signature requirements for candidates belonging to constituted parties in the state is 5% of the registered voters in the party for city council members or 900 signatures, whichever is less.  Based upon information and belief, the "rule of thumb" for collecting the number of signatures is three times the number of signatures required to ensure that a candidate is not "knocked off the ballot".

the United States of America of voters registered in the State of New York and the City of New York who do not belong to any constituted political parties.

## NEW YORK STATE IS AN OLIGARCHY

73. An oligarchy is defined in Black's Law Dictionary as a form of government wherein the administration of affairs is lodged in the hands of a few persons.

74. The NYSBOE and the NYCBOE were established on June 1, 1974 in the Executive Department of New York State.

75. There are a total of 14 commissioners and 2 executive directors making the rules and regulations for elections in New York State.

76. The Court is respectfully referred to Exhibit 6, which contains information that confirms statements 74 and 75.

76. Elections in New York State are controlled solely by the NYSBOE and the NYCBOE.

77. There are over 8 million persons residing in the City of New York and yet, the rules and regulations for elective office are controlled by only 16 people.

78. New York City is an oligarchy.

## NYCBOE VIOLATED MURAWSKI'S DUE PROCESS RIGHTS

79. After MURAWSKI submitted petitions for the Democratic Primary that was held on September 12, 2017, MURAWSKI expected to appear in front of the NYCBOE to argue that his name should be placed "on the ballot".

80. MURAWSKI was prepared with a sufficient number of copies of the order by Federal District Court Judge Korman in Molinari v. Powers, 82 F. Supp. 2d 57 - Dist. Court, ED New York 2000 that states:

*To the extent that Governor George W. Bush, Steve Forbes, Alan Keyes and Senator John McCain, as of the date of this order, have not qualified one or more delegate*

*candidates or alternate delegate candidates committed to them in any congressional district, they have until 5:00 p.m. on February 10, 2000 to submit names to the New York State Board of Elections (names must be qualified under Republican Party rules — i.e., enrolled Republicans who reside in the applicable congressional district — and facsimile transmission of names is acceptable as long as any such transmission is received by 5:00 p.m. on February 10, 2000). Upon receipt of the above-described lists of delegate candidates and alternate delegate candidates, the New York State Board of Elections shall certify the Primary ballot to be used in each of the state's congressional districts. The county boards of elections are directed to print the names of the delegate candidates and alternate delegate candidates on the March 7, 2000 Republican Primary ballot, in accordance with New York State Board of Elections certification procedures.*

*The breadth of this relief reflects in part the agreement of the parties. This is why Bush delegate candidates are included within the scope of the order, even though Governor Bush did not appear and formally request that portion of the relief that placed his delegate candidates on the ballot in the 16th Congressional District. Indeed, Mr. Keyes arguably was not entitled to the relief as it applies to him because he made no attempt to gather petitions to meet even the unchallenged statewide 5,000-signature requirement for presidential candidates, let alone the 0.5% requirement for delegate candidates, and he sought to intervene only after the petitioning period had ended. This concern, however, goes to the potential unfairness of allowing Mr. Keyes to "piggy back" upon the efforts of those candidates who went to the burden and expense of petitioning. See Mahon v. Abrams, 88 Civ. 1745, unpublished op. at 12-13 (S.D.N.Y. Mar. 21, 1988) (Sand, J.), aff'd without op., 847 F.2d 835 (2d Cir.1988) (declining to grant preliminary injunctive relief to supporters of Senator Dole and Pat Robertson by placing their delegate candidates on the ballot, since such relief could be granted only "if one were to eliminate entirely the requirement of any petitions or signatures for the Dole-Robertson slates" — a result that "would be exceedingly unfair to a candidate who engaged in the petition*

February 21, 2001
PAGE:   1

2000 GENERAL ELECTION
CITY OF NEW YORK

STATEMENT AND RETURN
OF THE VOTES FOR THE OFFICE OF
PRESIDENT AND VICE PRESIDENT
OF THE UNITED STATES

NO. OF CANDIDATES TO BE ELECTED:   1

R E C A P I T U L A T I O N

CITY OF NEW YORK

| COUNTIES | TOTAL PUBLIC COUNTER BALLOT | ABS/ MIL BALLOT | FED BALLOT | EMERG BALLOT | VALID AFFID BALLOT | TOTAL VOTE THIS OFFICE | REPUBLICAN 1A G W BUSH D CHENEY | DEMOCRATIC 1B A GORE J LIEBERMAN | INDEPENDENCE 1C J HAGELIN N GOLDHABER | CONSERVATIVE 1D G W BUSH D CHENEY | LIBERAL 1E A GORE J LIEBERMAN |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NEW YORK | 542124 | 28312 | 2005 | 4046 | 20232 * | 596750 * | 79487 | 432815 | 861 | 2626 | 7792 |
| BRONX | 299124 | 5914 | 548 | 1551 | 15769 * | 323291 * | 33224 | 256322 | 536 | 3021 | 4294 |
| KINGS | 592135 | 13631 | 1158 | 13018 | 22621 * | 642563 * | 90366 | 472399 | 897 | 6243 | 7736 |
| QUEENS | 545483 | 13460 | 1415 | 1765 | 13427 * | 576132 * | 113528 | 401067 | 721 | 8524 | 8311 |
| RICHMOND | 135116 | 4469 | 72 | 337 | 4505 * | 144525 * | 59187 | 70922 | 154 | 4716 | 1253 |
| TOTAL | 2113982 | 65786 | 5198 | 20717 | 76554 * | 2283261 * | 375792 | 1633525 | 3169 | 25130 | 29386 |

WE CERTIFY THIS STATEMENT TO BE CORRECT, AND HAVE CAUSED THE SAME
TO BE ATTESTED BY THE SIGNATURES OF THE MEMBERS OF THIS BOARD, OR
A MAJORITY THEREOF, ON THIS 21ST DAY OF February, 2001

.................
.................
SECRETARY

.................
.................
CHAIRMAN

.................
.................
CANVASSING BOARD

*Exhibit 2*

Exhibit 3

# Analysis of the Certified Election Results
## General Election of November 6, 2001 in the City of New York
### Compiled and Written by William E. Murawski

There are two parts to the Analysis of the Certified Election Results (ACER) for the General Election held in the City of New York on November 6, 2001 (hereinafter referred to as "the Election").

The first part of ACER is titled **Part I: A Comparative Analysis of Voters in the Election**. It utilizes information from the certified election results of the Board of Elections for the City of New York (hereinafter referred to as "the Board") for the Election, the voter registration rolls provided by the Board that is dated November 5, 2001, and statistical data from the United States Census Bureau for the year 2000 census for a comparative analysis of voters. The analysis is based on the total population, the total population that is of the legal age to vote and the entire population of registered voters in the City of New York.

The second part of ACER is titled **Part II: An Analysis of Unrecorded Votes in the Election** that focuses on the number of voters whose votes were not or could not be recorded (counted). The word "recorded" is used throughout ACER because it is the term that the Board uses for votes that have been counted. It is apparent that the Board also uses the term "unrecorded votes" instead of the more common term "votes that were not counted" when it describes the situation when a person casts a vote and that vote is not counted. Therefore the terms "unrecorded votes" or "votes that were not or could not be recorded" are used instead of the more popular phrase "votes that were not or could not be counted".

The analysis of the voters are presented on city and borough-wide basis for the elections of the Mayor, Public Advocate, Comptroller, Borough Presidents and City Council of the City of New York by using the sources of information provided by the Board and the United States Census. The political unit described as a "borough" on the comparative summaries in ACER is also referred to as a county of which there are five in the City of New York. However, for simplification purposes, all references to the county as a political unit will be made using the word "borough" because that is the most familiar term used and understood by the general population. The name of the county will be sometimes noted in parenthesis in parts of ACER to keep the reader aware that the words "borough" and "county" are synonymous in terms of ACER.

The results of the comparative analysis in ACER clearly reveals the level of participation of the people of the people of the City of New York in the Election and raises questions about the management and oversight of the electoral process by the Board of Elections for the City of New York for the general election that was held in the City of New York on November 6, 2001. All percentages in ACER are rounded the nearest full number.

It should be noted that three of the five boroughs of New York City -- Manhattan, Brooklyn and the Bronx -- are covered by Section 5 of the Voting Rights Act.

Copyright 2004 William E. Murawski                    All Rights Reserved                    1

**3. Election for the Comptroller in the Borough of Manhattan – New York County**
a. **15%** of the population of Manhattan who had their votes recorded (counted) by the Board elected the Comptroller.
b. **18%** of the population in Manhattan who are of the legal voting age who had their votes recorded (counted) by the Board elected the Comptroller.
c. **26%** of the population of registered voters in Manhattan who ad their votes recorded (counted) by the Board elected the Comptroller.

**4. Election for Mayor the Borough President of Manhattan – New York County**
a. **15%** of the population of Manhattan who had their votes recorded (counted) by the Board elected the Borough President of Manhattan.
b. **18%** of the population in Manhattan who are of the legal voting age who had their votes recorded (counted) by the Board elected the Borough President of Manhattan.
c. **26%** of the population of registered voters in Manhattan who had their votes recorded (counted) by the Board elected the Borough President of Manhattan.

**5. Elections for the City Council Members in the Borough of Manhattan – New York County**
a. **15%** of the population of Manhattan who had their votes recorded (counted) by the Board elected the City Council Members.
b. **18%** of the population in Manhattan who are of the legal voting age who had their votes recorded (counted) by the Board elected the City Council Members.
c. **26%** of the population of registered voters in Manhattan who had their votes recorded (counted) by the Board elected the City Council Members.

**2. Total Recorded Votes Summary:**  This summary for the Borough of Manhattan analyzes voters in the November 6, 2001 general election in the City of New York who voted either by going to the polls and pulled the lever in the mechanical voting booth or by the submission of a paper ballot, which includes absentee, emergency and affidavit ballots.  The summary includes **votes that were recorded (counted)** for all candidates in the elections held in the Borough of Manhattan for the elective offices of Mayor, Public Advocate, Comptroller, Borough President and City Council.  The summary **does not include** votes that were not or could not be recorded (unrecorded).

Analysis of voters are made on a borough basis using the statistical data from the United States Census Bureau for the year 2000 census and the number of voters registered in the City of New York in conjunction with the portions of the certified election results that demonstrates the number of people who voted as described in the previous paragraph.  Based on the aforementioned information, the statements designated with the letters a, b and c immediately below this paragraph regarding the elections in the Borough of Manhattan for Mayor, Public Advocate, Comptroller, Borough President of Manhattan and City Council are considered factual.  See Table CAV3-M on page 23 for reference.

Copyright 2004 William E. Murawski                    All Rights Reserved                    6

### 1. Election for Mayor in the Borough of Manhattan – New York County

a. **25%** of the population of Manhattan voted for the election of Mayor and had their votes recorded (counted).

b. **30%** of the population of Manhattan who are of the legal voting age voted for Mayor and had their votes recorded (counted).

c. **44%** of the population of registered voters in Manhattan voted for Mayor and had their votes recorded (counted).

### 2. Election for Public Advocate in the Borough of Manhattan – New York County

a. **18%** of the population of Manhattan voted for Public Advocate and had their votes recorded (counted).

b. **22%** of the population in Manhattan who are of the legal voting age voted for Public Advocate and had their votes recorded (counted).

c. **32%** of the population of registered voters in Manhattan voted for the Public Advocate and had their votes recorded (counted).

### 3. Election for the Comptroller in the Borough of Manhattan – New York County

a. **18%** of the population of Manhattan voted for the Comptroller and had their votes recorded (counted).

b. **21%** of the population of Manhattan who are of the legal voting age voted for Comptroller and had their votes recorded (counted).

c. **31%** of the population of registered voters in Manhattan voted for Comptroller and had their votes recorded (counted).

### 4. Election for Mayor the Borough President of Manhattan – New York County

a. **20%** of the population of Manhattan voted for the Borough President and had their votes recorded (counted).

b. **24%** of the population of Manhattan who are of the legal voting age voted for Borough President and had their votes recorded (counted).

c. **36%** of the population of registered voters in Manhattan who voted for Comptroller and their votes were recorded (counted).

### 5. Elections for the City Council in the Borough of Manhattan – New York County

a. **21%** of the population of Manhattan voted for City Council and had their votes recorded (counted).

b. **24%** of the population of Manhattan who are of the legal voting age voted for City Council and had their votes recorded (counted).

c. **37%** of the population of registered voters in Manhattan voted for City Council had their votes recorded (counted).

Copyright 2004 William E. Murawski    All Rights Reserved

### D: Comparative Analysis of Voters in the Borough of the Bronx
#### (Bronx County)

There are two summaries in the Comparative Analysis of Voters in the Borough of the Bronx. The Elected Candidates Summary demonstrates the percentages of people who **elected candidates** in the elections held in the Borough of the Bronx to represent them in the government of the City of New York in the offices of Mayor, Public Advocate, Comptroller, Borough President and the City Council.

The Total Recorded Votes Summary demonstrates the percentages of people who had their **votes recorded (counted)** for all candidates in the elections in the Borough of the Bronx for Mayor, Public Advocate, Comptroller, Borough President of the Bronx and Council of the City Council in the Election.

**1. Elected Candidates Summary:** This is a comparative analysis for people who voted in the November 6, 2001 General Election in the Borough of the Bronx and whose votes elected candidates to represent them in elective offices in the government of the City of New York for the offices of the Mayor, Public Advocate, Comptroller, Borough President of the Bronx and the City Council.

Analysis of voters are made on a borough basis using the statistical data from the United States Census Bureau for the year 2000 census and the number of voters registered in the Borough of the Bronx in conjunction with the portions of the certified election results that demonstrate the number of people whose votes were recorded (counted). Based on the aforementioned information, the statements designated with the letters a, b and c immediately below this paragraph regarding the elections held in the Borough of the Bronx for the Mayor, Public Advocate, Comptroller, the Borough President of the Bronx and the City Council are considered factual. See Table CAV2-B on page 22 for reference.

#### 1. Election for Mayor in the Borough of the Bronx – Bronx County
a. **6%** of the population of the Bronx who had their votes recorded (counted) by the Board elected the Mayor.
b. **9%** of the population in the Bronx who are of the legal voting age who had their votes recorded (counted) by the Board elected the Mayor. .
c. **14%** of the population of registered voters in the Bronx who had their votes recorded (counted) by the Board elected the Mayor.

#### 2. Election for Public Advocate in the Borough of the Bronx – Bronx County
a. **8%** of the population of the Bronx who had their votes recorded (counted) by the Board elected the Public Advocate.
b. **12%** of the population in the Bronx who are of the legal voting age who cast their votes and had those votes recorded (counted) by the Board elected the Public Advocate.
c. **19%** of the population of registered voters in the Bronx who cast their votes and had those votes recorded (counted) by the Board elected the Public Advocate.

Copyright 2004 William E. Murawski                All Rights Reserved                8

### 3. Election for the Comptroller in the Borough of the Bronx – Bronx County

a. **8%** of the population of the Bronx who had their votes recorded (counted) by the Board elected the Comptroller.

b. **11%** of the population in the Bronx who are of the legal voting age who had their votes recorded (counted) by the Board elected the Comptroller.

c. **18%** of the population of registered voters in the Bronx who ad their votes recorded (counted) by the Board elected the Comptroller.

### 4. Election for Mayor the Borough President of the Bronx – Bronx County

a. **8%** of the population of the Bronx who had their votes recorded (counted) by the Board elected the Borough President of the Bronx.

b. **12%** of the population in the Bronx who are of the legal voting age who had their votes recorded (counted) by the Board elected the Borough President of the Bronx.

c. **19%** of the population of registered voters in the Bronx who had their votes recorded (counted) by the Board elected the Borough President of the Bronx.

### 5. Elections for the City Council Members in the Borough of the Bronx – Bronx County

a. **8%** of the population of the Bronx who had their votes recorded (counted) by the Board elected the City Council Members.

b. **12%** of the population in the Bronx who are of the legal voting age who had their votes recorded (counted) by the Board elected the City Council Members.

c. **19%** of the population of registered voters in the Bronx who had their votes recorded (counted) by the Board elected the City Council Members.

**2. Total Recorded Votes Summary:**  This summary for the Borough of the Bronx compares people who voted in the November 6, 2001 general election in the City of New York whose members  voted either by going to the polls and pulled the lever in the mechanical voting booth or by the submission of a paper ballot, which includes absentee, emergency and affidavit ballots.  The summary includes **votes that were recorded (counted)** for all candidates in the elections held in the Borough of the Bronx for the elective offices of Mayor, Public Advocate, Comptroller, Borough President and City Council. The summary **does not include** votes that were not or could not be recorded (counted).

Analysis of voters are made on a borough basis using the statistical data from the United States Census Bureau for the year 2000 census and the number of voters registered in the City of New York in conjunction with the portions of the certified election results that demonstrates the number of people who voted as described in the previous paragraph.  Based on the aforementioned information, the statements designated with the letters a, b and c immediately below this paragraph regarding the elections in the Borough of the Bronx for Mayor, Public Advocate, Comptroller, Borough President of the Bronx and City Council are considered factual.  See Table CAV3-B on page 23 for reference.

### 1. Election for Mayor in the Borough of the Bronx – Bronx County

a. **14%** of the population of the Bronx voted for the election of Mayor and had their votes recorded (counted).

b. **20%** of the population of the Bronx who are of the legal voting age voted for Mayor and had their votes recorded (counted).

c. **32%** of the population of registered voters in the Bronx voted for Mayor and had their votes recorded (counted).

Copyright 2004 William E. Murawski                     All Rights Reserved                     9

### 2. Election for Public Advocate in the Borough of the Bronx – Bronx County

a. **9%** of the population of the Bronx voted for Public Advocate and had their votes recorded (counted).

b. **13%** of the population in the Bronx who are of the legal voting age voted for Public Advocate and had their votes recorded (counted).

c. **37%** of the population of registered voters in the Bronx voted for the Public Advocate and had their votes recorded (counted).

### 3. Election for the Comptroller in the Borough of the Bronx – Bronx County

a. **9%** of the population of the Bronx voted for the Comptroller and had their votes recorded (counted).

b. **13%** of the population of the Bronx who are of the legal voting age voted for Comptroller and had their votes recorded (counted).

c. **20%** of the population of registered voters in the Bronx voted for Comptroller and had their votes recorded (counted).

### 4. Election for Mayor the Borough President of the Bronx – Bronx County

a. **10%** of the population of the Bronx voted for the Borough President and had their votes recorded (counted).

b. **15%** of the population of the Bronx who are of the legal voting age voted for Borough President and had their votes recorded (counted).

c. **24%** of the population of registered voters in the Bronx who voted for Comptroller and their votes were recorded (counted).

### 5. Elections for the City Council in the Borough of the Bronx – Bronx County

a. **11%** of the population of the Bronx voted for City Council and had their votes recorded (counted).

b. **15%** of the population of the Bronx who are of the legal voting age voted for City Council and had their votes recorded (counted).

c. **24%** of the population of registered voters in the Bronx voted for City Council had their votes recorded (counted).

Copyright 2004 William E. Murawski                    All Rights Reserved

### 3. Election for the Comptroller in the Borough of Brooklyn – Kings County

a. **9%** of the population of Brooklyn who had their votes recorded (counted) by the Board elected the Comptroller.

b. **13%** of the population in Brooklyn who are of the legal voting age who had their votes recorded (counted) by the Board elected the Comptroller.

c. **20%** of the population of registered voters in Brooklyn who ad their votes recorded (counted) by the Board elected the Comptroller.

### 4. Election for Mayor the Borough President of Brooklyn – Kings County

a. **9%** of the population of Brooklyn who had their votes recorded (counted) by the Board elected the Borough President of Brooklyn.

b. **12%** of the population in Brooklyn who are of the legal voting age who had their votes recorded (counted) by the Board elected the Borough President of Brooklyn.

c. **20%** of the population of registered voters in Brooklyn who had their votes recorded (counted) by the Board elected the Borough President of Brooklyn.

### 5. Elections for the City Council Members in the Borough of Brooklyn – Kings County

a. **9%** of the population of Brooklyn who had their votes recorded (counted) by the Board elected the City Council Members.

b. **13%** of the population in Brooklyn who are of the legal voting age who had their votes recorded (counted) by the Board elected the City Council Members.

c. **21%** of the population of registered voters in Brooklyn who had their votes recorded (counted) by the Board elected the City Council Members.

**2. Total Recorded Votes Summary:**  This summary for the Borough of Brooklyn demonstrates voters in the November 6, 2001 general election in the City of New York who voted either by going to the polls and pulled the lever in the mechanical voting booth or by the submission of a paper ballot, which includes absentee, emergency and affidavit ballots.  The summary includes **votes that were recorded (counted)** for all candidates in the elections held in the Borough of Brooklyn for the elective offices of Mayor, Public Advocate. Comptroller, Borough President and City Council.  The summary **does not include** votes that were not or could not be recorded (unrecorded).

Analysis of voters are made on a borough basis using the statistical data from the United States Census Bureau for the year 2000 census and the number of voters registered in the City of New York in conjunction with the portions of the certified election results that demonstrates the number of people who voted as described in the previous paragraph.  Based on the aforementioned information. the statements designated with the letters a. b and c immediately below this paragraph regarding the elections in the Borough of Brooklyn for Mayor. Public Advocate, Comptroller, Borough President of Brooklyn and City Council are considered factual. See Table CAV3-K on page 23 for reference.

### 1. Election for Mayor in the Borough of Brooklyn – Kings County

a. **17%** of the population of Brooklyn voted for the election of Mayor and had their votes recorded (counted).

b. **23%** of the population of Brooklyn who are of the legal voting age voted for Mayor and had their votes recorded (counted).

c. **37%** of the population of registered voters in Brooklyn voted for Mayor and had their votes recorded (counted).

Copyright 2004 William E. Murawski     All Rights Reserved

**2. Election for Public Advocate in the Borough of Brooklyn – Kings County**

a. **11%** of the population of Brooklyn voted for Public Advocate and had their votes recorded (counted).

b. **15%** of the population in Brooklyn who are of the legal voting age voted for Public Advocate and had their votes recorded (counted).

c. **20%** of the population of registered voters in Brooklyn voted for the Public Advocate and had their votes recorded (counted).

**3. Election for the Comptroller in the Borough of Brooklyn – Kings County**

a. **11%** of the population of Brooklyn voted for the Comptroller and had their votes recorded (counted).

b. **15%** of the population of Brooklyn who are of the legal voting age voted for Comptroller and had their votes recorded (counted).

c. **24%** of the population of registered voters in Brooklyn voted for Comptroller and had their votes recorded (counted).

**4. Election for Mayor the Borough President of Brooklyn – Kings County**

a. **12%** of the population of Brooklyn voted for the Borough President and had their votes recorded (counted).

b. **16%** of the population of Brooklyn who are of the legal voting age voted for Borough President and had their votes recorded (counted).

c. **27%** of the population of registered voters in Brooklyn who voted for Comptroller and their votes were recorded (counted).

**5. Elections for the City Council in the Borough of Brooklyn – Kings County**

a. **13%** of the population of Brooklyn voted for City Council and had their votes recorded (counted).

b. **18%** of the population of Brooklyn who are of the legal voting age voted for City Council and had their votes recorded (counted).

c. **28%** of the population of registered voters in Brooklyn voted for City Council had their votes recorded (counted).

Copyright 2004 William E. Murawski                    All Rights Reserved

### F: Comparative Analysis of Voters in the Borough of Queens
(Queens County)

There are two summaries in the Comparative Analysis of Voters in the Borough of Queens. The Elected Candidates Summary demonstrates the percentages of voters who **elected candidates** in the elections held in the Borough of Queens to represent them in the government of the City of New York in the offices of Mayor, Public Advocate, Comptroller, Borough President and the City Council.

The Total Recorded Votes Summary demonstrates the percentages of people who had their **votes recorded (counted)** for all candidates in the elections in the Borough of Queens for Mayor, Public Advocate, Comptroller, Borough President of Queens and Council of the City Council in the Election.

**1. Elected Candidates Summary:** This is a comparative analysis of people who voted in the November 6, 2001 General Election in the Borough of Queens and whose votes elected candidates to represent them in elective offices in the government of the City of New York for the offices of the Mayor, Public Advocate, Comptroller, Borough President of Queens and the City Council.

Analysis of voters is made on a borough basis using the statistical data from the United States Census Bureau for the year 2000 census and the number of voters registered in the Borough of Queens in conjunction with the portions of the certified election results that demonstrate the number of people whose votes were recorded (counted). Based on the aforementioned information, the statements designated with the letters a, b and c immediately below this paragraph regarding the elections held in the Borough of Queens for the Mayor, Public Advocate, Comptroller, the Borough President of Queens and the City Council are considered factual. See Table CAV2-Q on page 22 for reference.

#### 1. Election for Mayor in the Borough of Queens – Queens County
a. **9%** of the population of Queens who had their votes recorded (counted) by the Board elected the Mayor.
b. **12%** of the population in Queens who are of the legal voting age who had their votes recorded (counted) by the Board elected the Mayor. .
c. **23%** of the population of registered voters in Queens who had their votes recorded (counted) by the Board elected the Mayor.

#### 2. Election for Public Advocate in the Borough of Queens – Queens County
a. **9%** of the population of Queens who had their votes recorded (counted) by the Board elected the Public Advocate.
b. **12%** of the population in Queens who are of the legal voting age who cast their votes and had those votes recorded (counted) by the Board elected the Public Advocate.
c. **22%** of the population of registered voters in Queens who cast their votes and had those votes recorded (counted) by the Board elected the Public Advocate.

Copyright 2004 William E. Murawski                All Rights Reserved                14

**3. Election for the Comptroller in the Borough of Queens – Queens County**
a. **9%** of the population of Queens who had their votes recorded (counted) by the Board elected the Comptroller.
b. **11%** of the population in Queens who are of the legal voting age who had their votes recorded (counted) by the Board elected the Comptroller.
c. **21%** of the population of registered voters in Queens who ad their votes recorded (counted) by the Board elected the Comptroller.

**4. Election for Mayor the Borough President of Queens – Queens County**
a. **9%** of the population of Queens who had their votes recorded (counted) by the Board elected the Borough President of Queens.
b. **11%** of the population in Queens who are of the legal voting age who had their votes recorded (counted) by the Board elected the Borough President of Queens.
c. **21%** of the population of registered voters in Queens who had their votes recorded (counted) by the Board elected the Borough President of Queens.

**5. Elections for the City Council Members in the Borough of Queens – Queens County**
a. **9%** of the population of Queens who had their votes recorded (counted) by the Board elected the City Council Members.
b. **11%** of the population in Queens who are of the legal voting age who had their votes recorded (counted) by the Board elected the City Council Members.
c. **21%** of the population of registered voters in Queens who had their votes recorded (counted) by the Board elected the City Council Members.

**2. Total Recorded Votes Summary:**  This summary for the Borough of Queens demonstrates voters in the November 6, 2001 general election in the City of New York who voted either by going to the polls and pulled the lever in the mechanical voting booth or by the submission of a paper ballot, which includes absentee, emergency and affidavit ballots.  The summary includes **votes that were recorded (counted)** for all candidates in the elections held in the Borough of Queens for the elective offices of Mayor, Public Advocate, Comptroller, Borough President and City Council.  The summary **does not include** votes that were not or could not be recorded (counted).

Analysis of voters are made on a borough basis using the statistical data from the United States Census Bureau for the year 2000 census and the number of voters registered in the City of New York in conjunction with the portions of the certified election results that demonstrates the number of people who voted as described in the previous paragraph.  Based on the aforementioned information, the statements designated with the letters a. b and c immediately below this paragraph regarding the elections in the Borough of Queens for Mayor, Public Advocate, Comptroller. Borough President of Queens and City Council are considered factual.  See Table CAV3-Q on page 23 for reference.

**1. Election for Mayor in the Borough of Queens – Queens County**
a. **17%** of the population of Queens voted for the election of Mayor and had their votes recorded (counted).
b. **22%** of the population of Queens who are of the legal voting age voted for Mayor and had their votes recorded (counted).
c. **41%** of the population of registered voters in Queens voted for Mayor and had their votes recorded (counted).

Copyright 2004 William E. Murawski                    All Rights Reserved

## Part II: Analysis of Unrecorded Votes in the Election

The Analysis of Unrecorded Votes in the Election that was held in the City of New York on November 6, 2001 contains summaries for each of the five political units known as boroughs or counties in the City of New York.   The numbers in each of the five summaries are derived directly from the certified election results from the Board of Elections of the City of New York for the Election.   The focus of these summaries is votes that were not or could not be recorded (counted) by the Board of Elections for the City of New York in each of the elections for the elective offices of Mayor, Public Advocate, Comptroller the Borough Presidents and the Council of the City of New York.

See Tables AUV-M, AUV-B, AUV-K, AUV-Q, AUV-R on pages 26 to30 for reference regarding the statements made below this paragraph that are designated with the letters a through e regarding the elections of candidates to the elective offices of Mayor, Public Advocate, Comptroller, Borough Presidents and Council of the City of New York.  The information contained within each table are based solely on the certified election results for the General Election that was held in the City of New York on November 6, 2001 and are segmented by borough.

### Elections for City Wide Offices of Mayor, Public Advocate and Comptroller

In the city-wide elections. the election for the Mayor of the City of New York, the numbers show a **3%** average across the five Boroughs for votes that were not or could not be recorded (counted).  The elections for the  Public Advocate and Comptroller respectively demonstrate a **40%** and **43%** average of votes that were not or could not be recorded (counted)city-wide**.**

#### 1. Election for Mayor
a. **2%** of the votes were not or could not be recorded (counted) in the election for Mayor in the Borough of Manhattan.
b. **3%** of the votes were not or could not be recorded (counted) in the election for Mayor in the Borough of the Bronx.
c. **3%** of the votes were not or could not be recorded (counted) in the election for Mayor in the Borough of Brooklyn.
d. **3%** of the votes were not or could not be recorded (counted) in the election for Mayor in the Borough of Queens.
e. **2%** of the votes were not or could not be recorded (counted) in the election for Mayor in the Borough of Staten Island.

#### 2. Election for Public Advocate
a. **41%** of the votes were not or could not be recorded (counted) in the election for Public Advocate in the Borough of Manhattan.
b. **37%** of the votes were not or could not be recorded (counted) in the election for Public Advocate in the Borough of the Bronx.
c. **35%** of the votes were not or could not be recorded (counted) in the election for Public Advocate in the Borough of Brooklyn.
d. **38%** of the votes were not or could not be recorded (counted) in the election for Public Advocate in the Borough of Queens.
e. **47%** of the votes were not or could not be recorded (counted) in the election for Public Advocate in the Borough of Staten Island.

#### 3. Election for Comptroller

a. **48%** of the votes were not or could not be recorded (counted) in the election for Comptroller in the Borough of Manhattan.
b. **37%** of the votes were not or could not be recorded (counted) in the election for Comptroller in the Borough of the Bronx.
c. **38%** of the votes were not or could not be recorded (counted) in the election for Comptroller in the Borough of Brooklyn.
d. **41%** of the votes were not or could not be recorded (counted) in the election for Comptroller in the Borough of Queens.
e. **49%** of the votes were not or could not be recorded (counted) in the election for Comptroller in the Borough of Staten Island.

### 4. Elections for Borough Presidents

a. **27%** of the votes were not or could not be recorded (counted) in the election of  Borough President of Manhattan.
b. **29%** of the votes were not or could not be recorded (counted) in the election of the Borough President of the Bronx.
c. **31%** of the votes were not or could not be recorded (counted) in the election of the Borough President of Brooklyn.
d. **27%** of the votes were not or could not be recorded (counted) in the election of the Borough President of Queens.
e. **7%** of the votes were not or could not be recorded (counted) in the election for the Borough President of Staten Island.

### 5. Elections in City Council Districts

a. **28%** of the votes were not or could not be recorded (counted) in the elections for City Council in the Borough of Manhattan.
b. **30%** of the votes were not or could not be recorded (counted) in the elections for City Council in the Borough of the Bronx.
c. **27%** of the votes were not or could not be recorded (counted) in the elections for City Council in the Borough of Brooklyn.
d. **26%** of the votes were not or could not be recorded (counted) in the elections for City Council in the Borough of Queens.
e. **18%** of the votes were not or could not be recorded (counted) in the elections for City Council in the Borough of Staten Island.

Sixteen (16) elections for the City Council are in the **10% to 19%**: twenty-five (25) elections for the City Council are in the **20% to 29%**; and fourteen (14) elections for the City Council are in the **30% and above** percentage ranges for votes that were not or could not be recorded (counted).

**78%** of the votes that were not or could not be recorded is in the election that was held in the Borough of Manhattan for the 22nd City Council District is the highest percentage of votes that were not or could not be recorded (counted) in all elections for City Council.  The Borough of the Bronx has the second highest percentage of votes that were not or could not be recorded (counted) in the election for the 8th City Council District at **45%**.

It should be noted that boundaries for City Council Districts 8, 22 and 50 as defined in the City of New York violate section § 52.e of the Charter of the City of New York regarding districting that states: A district shall not cross borough or county boundaries.

Copyright 2004 William E. Murawski                    All Rights Reserved                    25

# TheVillager

*Since 1933*

Volume 75, Number 14 | **August 24 - 30, 2005**

## Scoopy's notebook

**More PEP-to bismo:** In the latest Park Enforcement Patrol incident in Hudson River Park in the Village, perennial candidate Bill Murawski of Clinton says two women volunteers with his campaign who were collecting petition signatures to get him on the ballot in November on a third party line were recently hassled by about four PEP's. One woman was apparently very shaken up after the PEP's confronted her, with one almost allegedly chest-bumping her, as she was trying to buy a hot dog. Long story short, Murawski got a permit from the Hudson River Park Trust allowing him to gather signatures in the park. Yet, Chris Martin, the Trust's spokesperson, said a petition isn't actually needed for signature collecting. So was the permit issued basically to restrain the overzealous PEP's? No, Martin said, it's just to help make things clear.

**Dorm denial:** Word on the street is that New York University is planning a new dorm at a large site on E. 13th at First Ave. at the location of a former lumber store. But John Beckman, N.Y.U.'s spokesperson, said while the developer may conceivably have reached out to the university, they're not interested.

**Urning man:** In last week's issue, a letter writer noted an old photo of her father in Washington Square Park in the 1920s showed the fountain with — urns. Luther Harris, author of THE book on the square, informs us that urns weren't on the fountain in 1852 when it was installed in the park or in the park's 1869-'70 redesign, but were installed in the 1920s and stayed there until the early 1940s — so clearly they weren't original. The park's 1869-'70 redesign did not include urns, and Harris notes, Central Park's Bethesda Terrace, on which the square's fountain plaza is modeled, does not have urns around its fountain. Harris is skeptical there were ever urns on the fountain originally. Referring to the landscape architect who has done the park's current redesign plan, Harris said, "Urns are a George Vellonakis fantasy with no basis in history except for that 20 or so years when the square was gussied up with urns."

**Koch on drugs:** Former Mayor Ed Koch has been lobbying to get Canadian pharmaceuticals across the border and into the U.S., where they would sell for 50 percent the cost of domestically priced drugs. Hizzoner recently wrote Mark Kissinger, deputy secretary to the governor for health and human services, to ask Governor Pataki to join the other seven governors who back re-importing American-made pharmaceuticals after they've been sent to Canada. But Koch says Kissinger told him the fear is the drugs might have been tampered with, so it's dangerous to re-import them. "That's bulls—t!" Koch said. "They're made in the U.S.A.!" Koch says he takes 10 prescription drugs every morning, and "They work." Despite suffering a stroke in 1986 and a heart attack in 1999, he's doing very well. But like other seniors, he'd feel better if he didn't have to pay through the nose for his pills.

**Cohen of Arabia:** According to John Penley, self-described "dog-sitter and errand boy" for radical attorney Stanley Cohen, it now looks like Cohen may not get Saddam Hussein after all as a client in his upcoming trial. Cohen was recently able to get into Iraq, though was unable to meet with Hussein's family. According to friends of Hussein's family whom Cohen spoke to, the family has reportedly fired all their lawyers because they don't feel it's going to be a fair trial and are

Reader Services

thevillager.com

Search

Email our editor

**View our previous issues**

Report Distribution Problems

**Also Read:**



**ADVERTISING**



EF159455146US

FREDERIC M. UMANE
PRESIDENT

ROSANNA VARGAS
SECRETARY

JOSE MIGUEL ARAUJO.
JOHN FLATEAU
MARIA R. GUASTELLA
MICHAEL MICHEL
ALAN SCHULKIN
SIMON SHAMOUN
ROBERT SIANO
JOHN Wm. ZACCONE
COMMISSIONERS

MICHAEL J. RYAN
EXECUTIVE DIRECTOR

DAWN SANDOW
DEPUTY EXECUTIVE DIRECTOR

PAMELA GREEN PERKINS
ADMINISTRATIVE MANAGER

GEORGEA KONTZAMANIS
OPERATIONS MANAGER

STEVEN H. RICHMAN
GENERAL COUNSEL

## BOARD OF ELECTIONS
IN
THE CITY OF NEW YORK
EXECUTIVE OFFICE, 32 BROADWAY
NEW YORK, NY 10004–1609
(212) 487–5300
www.vote.nyc.ny.us

Bill Murawski
(Candidate/Contact Person)

July 27, 2017

Dear Sir:

The Commissioners of Elections (or duly constituted committee thereof), pursuant to the provisions of Rule D6 of the Board's Designating Petition Rules for the September 12, 2017 Primary Election, at a meeting held on July 25, 2017, determined that the following **will not appear on the ballot** for the September 12, 2017 Primary Election since the Amended Cover Sheet filed **did not** comply with the New York State Election Law and/or the Rules of the Board of Elections for the following reason:

The Amended Cover Sheet does not contain a statement that the petition contains a sufficient number, or in excess of the number, of valid signatures required by the Election Law or the New York City Charter.

| Candidate | Party | Office/Position | District |
|-----------|-------|-----------------|----------|
| Bill Murawski | Democratic | Mayor | Citywide |

*Received AUG 9th 2017 NOON*

Very truly yours,

THE COMMISSIONERS OF ELECTIONS
IN THE CITY OF NEW YORK

RECEIVED
GENERAL COUNSEL
BOARD OF ELECTIONS
IN THE CITY OF NEW YORK
2017 JUL 27 P 5:36

Exhibit 8

**The New York Times**        https://nyti.ms/1aWpHII

N.Y. / REGION

# Lever Voting Machines and New Runoff Date Are Approved by Cuomo

By THOMAS KAPLAN    JULY 9, 2013

The New York City Board of Elections voted unanimously on Tuesday to use lever voting machines for the mayoral primary election and the runoff that is expected to follow.

The board's action came a day after Gov. Andrew M. Cuomo signed legislation that authorized the return of the machines, which had been replaced in 2010 by more modern electronic voting devices. The measure signed by Mr. Cuomo also moves the date of the runoff to Oct. 1, from Sept. 24.

"Using the lever machines gives us a much greater degree of confidence that we'll be able to conduct a primary and runoff in the time frame appropriated," said Steven H. Richman, the general counsel for the Board of Elections, who described the change as a "temporary, short-term accommodation."

Government watchdog groups and advocates for people with disabilities had hoped that Mr. Cuomo, a Democrat, would veto the legislation allowing the return of the lever machines. And his approval message suggested that he was signing the measure with misgivings: The governor described the return of the lever machines as "a poor solution" that "poses significant problems for voters," including people with disabilities.

"Nevertheless, circumstances require that I sign this bill into law," he wrote. "Preventing the use of lever voting machines through a veto could profoundly impact the integrity of this year's elections."

The elections board asked for the change, arguing that it would probably not be able to tabulate the primary results using the optical scan voting machines and then prepare for a runoff.

"Obviously this process has been a wake-up call for us," said Simon Shamoun, the Republican elections commissioner from Brooklyn. He said the optical scan machines "are not going anywhere" and added, "We have four years to figure it out, and hopefully we're not in this position next time around."

The primary is scheduled for Sept. 10. The Oct. 1 runoff will be held if no candidate for mayor, public advocate or comptroller gets 40 percent of the vote. The general election is Nov. 5, and on that date, the city would again use optical scan voting machines.

Lawmakers opted to move the date of the runoff because the original date, Sept. 24, was during the Jewish holiday of Sukkot.

A version of this article appears in print on July 10, 2013, on Page A18 of the New York edition with the headline: Board Votes To Reinstate Old Machines For Primary.

© 2017 The New York Times Company