UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

**MOTION INFORMATION STATEMENT**

Docket Number(s): _____                    Caption [use short title]

Motion for: _WRIT OF MANDAMUS_

WILLIAM MURAWSKI, BETTER KNOWN AS
BILL MURAWSKI, AND ALL OTHER SIMILARLY
SITUATED CANDIDATES
                                    AS THE PLAINTIFF(S)

Set forth below precise, complete statement of relief sought:

TEMPORARY RESTRAINING ORDER (TRO)
TO TEMPORARILY POSTPONE THE
GENERAL ELECTION TO BE HELD
ON NOVEMBER 7 2017 FOR
CONSTITUTIONAL VIOLATIONS, AND
REQUEST FOR A THREE-JUDGE PANEL

                        V.

NEW YORK STATE BOARD OF ELECTIONS,
NEW YORK CITY BOARD OF ELECTION
AND THE NEW YORK CITY CAMPAIGN
FINANCE BOARD
                        AS THE DEFENDANTS

MOVING PARTY: _WILLIAM MURAWSKI_          OPPOSING PARTY: _____

[✓] Plaintiff       [ ] Defendant

[ ] Appellant/Petitioner   [ ] Appellee/Respondent

MOVING ATTORNEY: _WILLIAM MURAWSKI_          OPPOSING ATTORNEY: _____
[name of attorney, with firm, address, phone number and e-mail]

PRO-SE LITIGANT
530 W. 50TH ST; NY, NY 10019
(917) 407-6462

Court-Judge/ Agency appealed from: _JUDGE SWEET - SOUTHERN DISTRICT OF NY_

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
[✓] Yes [ ] No (explain): _____

Opposing counsel's position on motion:
[ ] Unopposed [ ] Opposed [✓] Don't Know
Does opposing counsel intend to file a response:
[ ] Yes [ ] No [✓] Don't Know

Is oral argument on motion requested? [✓] Yes [ ] No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? [ ] Yes [✓] No If yes, enter date: _____

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
INJUCTIONS PENDING APPEAL:
Has this request for relief been made below? [✓] Yes [ ] No
Has this relief been previously sought in this court? [ ] Yes [✓] No
Requested return date and explanation of emergency:

JUDGE SWEET OF THE DISTRICT
COURT OF THE SOUTHERN DISTRICT
OF NY HAS IGNORED ALL REQUEST
FOR TRO + 3 JUDGE PANEL.

Signature of Moving Attorney:
_William Murawski_ Date: _____   Service by: [ ] CM/ECF [✓] Other [Attach proof of service]

Form T-1080 (rev.12-13)

# 17 CV 6859

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

WILLIAM MURAWSKI, better known
as BILL MURAWSKI, and all other
candidates who are similarly situated

Plaintiff(s)-Appellant(s)

v.

NEW YORK STATE BOARD OF ELECTIONS,
NEW YORK CITY BOARD OF ELECTIONS and
NEW YORK CITY CAMPAIGN FINANCE BOARD

Defendants-Appellees

---

# *Writ of Mandamus*
## (Emergency Writ - Time Sensitive)

---

Brief of Appellant William Murawski

William Murawski, Pro-Se Litigant
530 West 50th Street  Apt 5A
New York, NY 10019
(917) 407-6492

Page 1

# Table of Contents

|  | Page |
|---|---|
| Table of Contents | 2 |
| Table of Authorities | 3 |
| Statutes and Rules | 3 |
| Statement of Subject Matter and Jurisdiction | 4 |
| Statement of Issues Presented for Review | 5 |
| Statement of the Case | 6 |
| Statement of the Facts | 9 |
| Summary of the Argument | 15 |
| Argument | 18 |
| Conclusion | 20 |
| Certificate of Compliance Certificate of Service | 21 |
| Appendix* | 22 |

*NOTE: The Appendix contains documented evidence that supports the statements made in this Writ of Mandamus. All documented evidence appears in the Appendix in the order in which it was presented herein.

# Table of Authorities

Molinari v. Powers, 82 F. Supp. 2d 57 (E.D.N.Y. 2000)

Farmer v. Brennan, Warden et al 511 U.S. 825 (1994)

Citizens United v. Federal Election Commission 130 S.Ct. 876 (2010)

American Law and Economic Review Abstracts . . . . . . . . . . . . . . .

> *What Determines Judicial Prestige? An Empirical Analysis for Judges of the Federal Court of Australia*
> *Pensions, Politics, and Judicial Tenure: An Empirical Study of Federal Judges, 1869–2002*

New England Journal of Medicine Article . . . . . . . . . . . . . . . . . . . . .

> *Age, Neuropathology, and Dementia* by George M. Savva, Ph.D., Stephen B. Wharton, F.R.C.Path., Paul G. Ince, M.D., Gillian Forster, B.Sc., Fiona E. Matthews, Ph.D., and Carol Brayne, M.D., for the Medical Research Council Cognitive Function and Aging Study.  Published in the New England Journal of Medicine 2009; May 28, 2009; 360: 2302-2309.

## STATUTES

New York State Election Law
New York City Charter
Help America Vote Act (HAVA)
1st, 4th and14th Amendments to the Constitution
The Americans With Disabilities Act of 1990
28 U.S. Code § 2284
42 U.S. Code § 1986
42 U.S. Code § 1985 (3)

## RULES

FRAP 21. Writs of Mandamus and Prohibition, and Other Extraordinary Writs

# Statement and Subject Matter
## and
## Appellate Jurisdiction

In MURAWSKI et al v. New York State and New York City Boards of Election and the NYC Campaign Finance Board (17 CV 6859) the subject matter is regarding the most precious gift America can offer. It is called the Freedom of Speech, which is a gift granted and protected by the 1st Amendment to the Constitution of the United States of America.

The Second Circuit for the United States Court of Appeals has jurisdiction as the Writ of Mandamus presented to it for 17 CV 6859 is a case in the Southern District of New York of which the Second Circuit of the United States Court of Appeals has jurisdiction. Since the Federal Court of the Southern District of New York was unable to properly protect the Freedom of Speech granted and protected by the 1st Amendment to the United States of America, the Second Circuit for the United States Court of Appeals is being called on to protect it.

## Statement of Issues Presented for Review

WILLIAM MURAWSKI is hereinafter referred to as "MURAWSKI".

MURAWSKI filed a Civil Rights Complaint in the Federal Court of the Southern District of New York on September 8, 2017. The case was assigned to Judge Sweet, who is semi-retired. (See Appendix Page 1)

In the Complaint MURAWSKI submitted to the Federal Court of the Southern District (CV 17 6859) MURAWSKI requested as relief, a Temporary Restraining Order of the Primary Elections that were to be and were held on September 12, 2107. MURAWSKI also requested a three-judge panel in accordance to 28 U.S. Code § 2284. (See Appendix Pages 1 to 5)

Since MURAWSKI did not receive an order from Judge Sweet regarding the request for a Temporary Restraining Order ("TRO") and or the request for a three judge panel shortly after the primary election was completed on September 12, 2017, on or about September 15, 2017 MURAWSKI contacted Judge Sweet's scheduling clerk (Tsz Chan) to question if the case had been scheduled for a pre-trial hearing or conference, which based upon the clerk's response of surprise, obviously it was not. MURAWSKI reminded the clerk that a TRO had been requested in addition to the request of a three judge panel in accordance to 28 U.S. Code § 2284 (See Appendix 6). MURAWSKI was left with the impression that a pre-trial conference would be scheduled immediately, however it was not. The pre-trial conference was scheduled for October 10, 2017, which is **33 days** after the original Complaint was filed and approximately **11 days** after MURAWSKI spoke with the clerk on or about September 15, 2017. (See Appendix Pages 6 and 7)

Judge Sweet did not issue an order on either request. However, Judge Sweet did acknowledge receiving and scheduling the Motion to Dismiss by the New York State Attorney General and the Motion to Dismiss by the NYC Corporation Counsel on November 22, 2017. (See Appendix Pages 8 and 9)

Not satisfied that Judge Sweet did not acknowledge anything with any type of order or direction, MURAWSKI filed an Amended Complaint on September 22, 2017 and once again a TRO and a three-judge-panel was requested. And once again, Judge Sweet's ignored both the TRO and the request for a three-judge-panel. (See Appendix Pages 10 to 13)

It should be noted that in the early morning hours of September 29, 2017, the kitchen in MURAWSKI's apartment went on fire, which resulted in 2nd and 3rd degree burns on MURAWSKI's hands, feet, knee, belly, shoulder and the right under-arm. MURAWSKI found himself in the burn unit of the New York Presbyterian-Cornell

Weill Hospital two days later. MURAWSKI woke up but could not talk or open his eyes to see. MURAWSKI was released from the hospital on October 19, 2017 after a 21 day stay to treat MURAWSKI'S injuries. (See Appendix Page 14)

Since MURAWSKI understood the upcoming pre-trial conference was scheduled for October 10, 2017, and he believed the approximate date he would be released from the hospital was Tuesday October 17, 2017 as a result of many conversations with the attending physicians, MURAWSKI verbally requested a one-week extension from Tsz Chan (scheduling clerk for Judge Sweet) to October 17, 2017, which was granted.

On the morning of Monday October 16, 2017, which was one day prior to the pre-trial conference and it was clear that MURAWSKI was not going to be released in time to attend the conference, MURAWSKI contacted Jasmin who is the law clerk handling MURAWSKI's case. MURAWSKI requested that the venue of the pre-trial conference be changed to his hospital room and Jasmin requested MURAWSKI send a letter to Judge Sweet to request it, which of course was denied. (See Appendix Pages 15 to 19)

Judge Sweet never acknowledged, **not one but two** Temporary Restraining Orders (TROs). Judge Sweet did not call for a three-judge-panel **not once but twice** as requested by MURAWSKI and required by law (28 U.S. Code § 2284 (b) (1)). (See Appendix Page 20)

Judge Sweet denied an appropriate accommodation to MURAWSKI as required by the Americans with Disabilities Act of 1990 when MURAWSKI attempted to have the pre-trial conference held in his hospital room on October 17, 2017.

## Statement of the Case

Judge Robert Sweet was appointed to the Southern District of New York by President Jimmy Carter and confirmed in 1978. He semi-retired into senior status in 1991. Judge Sweet is currently 95 years old. It is unknown whether or not Judge Sweet continues to figure skate to keep in shape and to relax.

It is interesting to note that Robert Sweet urged John Lindsay to run for mayor of New York City and worked on the campaign. As Mayor Lindsay's deputy mayor from 1966 to 1969, Sweet was known for keeping his home phone number listed, to field calls and complaints from the public. It is also interesting to note that one of Sweet's law clerks was Eliot Spitzer, who later became the Attorney General for the State of New York and thereafter, Governor of the State of New York.

Included in the Table of Authorities are abstracts from three articles published at the American Law and Economic Review regarding the issues surrounding the retirement of federal judges. (See APPENDIX Pages 21 and 22) .

Interestingly, the article titled *The Political Ideologies of Law Clerks* by Adam Bonica Adam S. Chilton Jacob Goldin Kyle Rozema Maya Sen concludes that "the relationship between ideology and the hiring of clerks and find that the ideology of judges is strongly correlated with the ideology of their clerks."

In Robert Sweet's earlier career one of his law clerks was Eliot Spitzer who was a voracious crime fighter, especially when he served as the Attorney General of the State of New York. As the deputy mayor serving Mayor John Lindsay, Deputy Mayor Robert Sweet published his home telephone number to receive complaints from the public.

The New England Journal of Medicine Article titled *Age, Neuropathology and Dementia* is not included in the table of authorities to allege, accuse or suggest that Judge Sweet has any type of mental-emotional defect but to remind the readers of this Writ of Mandamus of the effects that aging can have on each and every one of us. (See Appendix pages 23 to 31)

Clearly, in his earlier career Robert Sweet would have jumped on the case that MURAWSKI filed and action would have assuredly taken place in a timely manner. Today, Judge Sweet May be served by wonderfully talented law clerks, but they, just like Judge Sweet don't have the "fire in the belly" for a legal case that should be of high public interest, especially considering all of the stories about the Russians attempting to interfere in the elections in America and the stories about "rigged" elections regarding the Presidential Elections that were held in 2016.

Not only should MURAWSKI have his day in Court on Monday in the afternoon of November 6, 2017 for the opportunity to present his case to the judges of the Second Circuit Court of Appeals, it would be a matter of great interest as We the People will find out how elections are controlled by the few in New York State.

# Facts of the Case

The basis for MURAWSKI'S claims and allegations in the Amended Complaint (17 CV 6859) come from experiences with the electoral process in New York State beginning in 1999 when MURAWSKI entered into a "Special Election" for the elective office of City Council of the City of New York Councilmanic District 3. Not only did MURAWSKI discover that the data base of registered voters was corrupt, MURAWSKI also discovered how the candidates can make up the rules as they go along during an election campaign.

MURAWSKI also discovered that write-in votes were not being counted and or reported in the Presidential Election of 2000, a right that New York State provides its voters. (See Appendix Page 32 and 33)

MURAWSKI also discovered that the Election Law of New York State, hereinafter referred to as "the Election Law", violates the Charter of the City of New York in terms of creating the districts of the city council of New York. The New York City Charter Section § 52 (e) states that a district shall not cross borough or county lines.

Melissa Mark-Viverito serves as the Speaker of the New York City Council representing the 8th City Council District, which includes El Barrio/East Harlem and the South Bronx. Antonio Reynoso represents the 34th City Council District representing residents of Bushwick and Williamsburg in Brooklyn and Ridgewood in Queens. Both districts violate City Charter Section § 52 (e) districting requirement.

Much will be revealed about the redistricting and gerrymandering of New York Senate Districts along with the game of musical chairs that is played by city and state elected officials since New York City instituted term limits on all city-wide and district elective offices. Such revelations could bring the Second District Court of Appeals to a few interesting questions:

## Is New York State a democracy or oligarchy?

## Or is it a budding monarchy quietly in the making?

## Is New York the most unconstitutional state in the United States of America?

The most fundamental right granted and protected by the 1st Amendment Free Speech Clause of the Constitution of the United States of America is at risk in New York State. The administration and management of the Election Law of New York State by the New York State Board of Elections and the New York City Board of Elections transformed a democratically supported Republic government to an Oligarchy and/or Monarchy whereby elected officials in New York State can and do

hand pick their successors; place family members in the offices vacated by them while being elected to other public offices; and manipulate the election process.

Adding further insult to injury to the FREE SPEECH clause of the 1st Amendment of the Constitution of the United States is that the New York City Campaign Finance Board exists to further abridge the 1st Amendment Right of those candidates who reached the pinnacle of "getting on the ballot" by successfully "jumping through the hoops" defined by the New York State Election Law to have their names placed on the ballot.  The New York City Campaign Finance Board is also a contribution generating machine that fills the coffers of already elected and those candidates (s)elected to run for public office by the two major parties through its Matching Funds Program.

The basic foundation of attaining ballot access in New York State is based upon the whims of only **14 persons** who are appointed as Commissioners of the New York State and City Boards of Election by the two major parties. This is an oligarchy! (See Appendix Pages 34 and 35)

Although all candidates campaigning for elective representing the residents of New York State and City office fall under the category of "candidate" it is interesting to note that federal, state and local primary elections are scheduled at different times during the year.   For example, the 2016 Presidential Primary was held on April 19, 2016, the 2016 Congressional Primary was held on June 28, 2016 and the State and Local Primaries were held on September 13, 2016.  Considering the 2016 General Election was held on November 8, 2016, Presidential Candidates had 213 days to communicate their message to the voters; Congressional Candidates had 133 days to communicate their message to the voters; and State and Local Candidates had 56 days to communicate their message to the voters.

### WHO'S ON FIRST?!

The term "All Politics is Local" is a common phrase in U.S. politics.  The former Speaker of the United States House of Representatives Tip O'Neill is most closely associated with this phrase.

Since local government **DIRECTLY AFFECTS** its residents while the Federal Government is considered more of a **"trickle down"** nature because it takes time for federal regulations and statutes to have an effect on state and local residents, the question remains:

Why did state and local candidates have only **56** days to communicate their message to the voters and the Presidential and Congressional Candidates had **231** and **133** days respectively, to communicate their message to the voters?

In simple terms, Presidential Candidates had **175 more days** than state and local candidates to communicate their message to the voters while Congressional Candidates had **77 more days** than state and local candidates to communicate their message to the voters. And only **56 days** for local candidates to communicate their message to the voters. **Really?**

The requirements set forth in the New York State Election Law and those published by the New York State Board of Elections to attain "ballot access" for the category of candidate is sometimes based upon gathering the number of signatures arbitrarily designated by the New York State Board of Elections, or by its arbitrary discretion, such as in 2016 when the New York State Board of Elections could decide that if a Presidential Candidate in the Republican Party can be "certified as a nationally known or matching fund candidate" he or she will automatically be placed on the ballot without submitting any signatures. (See Appendix Pages 36 and 37).

The discretion of the New York State Board of Elections is a far cry from 1999 when the effect of Molinari v. Powers, 82 F. Supp. 2d 57 (E.D.N.Y. 2000) when a precedent was set in New York State. Allen Keyes piggybacked on Molinari v. Powers and was placed on the ballot for a candidate for President in the Republican Primary. The following is the decision of Federal District Judge Korman, of the United States Court for the Eastern District of New York, which placed Keyes on the ballot without submitting one signature.

## Judge Korman: Conclusion

*To the extent that Governor George W. Bush, Steve Forbes, Alan Keyes and Senator John McCain, as of the date of this order, have not qualified one or more delegate candidates or alternate delegate candidates committed to them in any congressional district, they have until 5:00 p.m. on February 10, 2000 to submit names to the New York State Board of Elections (names must be qualified under Republican Party rules i.e., enrolled Republicans who reside in the applicable congressional district and facsimile transmission of names is acceptable as long as any such transmission is received by 5:00 p.m. on February 10, 2000). Upon receipt of the above-described lists of delegate candidates and alternate delegate candidates, the New York State Board of Elections shall certify the Primary ballot to be used in each of the state's congressional districts. The county boards of elections are directed to print the names of the delegate candidates and alternate delegate candidates on the March 7, 2000 Republican Primary ballot, in accordance with New York State Board of Elections certification procedures.*

*The breadth of this relief reflects in part the agreement of the parties. This is why Bush delegate candidates are included within the scope of the order, even though Governor Bush did not appear and formally request that portion of the relief that placed his delegate candidates on the ballot in the 16th Congressional District. Indeed, Mr. Keyes arguably was not entitled to the relief as it applies to him because he made no attempt to gather petitions to meet even the unchallenged statewide 5,000-signature requirement for presidential candidates, let alone the 0.5% requirement for delegate candidates, and he sought to intervene only after the petitioning period had ended. This concern, however, goes to the potential unfairness of allowing Mr. Keyes to "piggy back" upon the efforts of those candidates who went to the burden and expense of petitioning. See Mahon v. Abrams, 88 Civ. 1745, unpublished op. at 12-13 (S.D.N.Y. Mar. 21, 1988) (Sand, J.), aff'd without op., 847 F.2d 835 (2d Cir.1988) (declining to grant preliminary injunctive relief to supporters of Senator Dole and Pat Robertson by placing their delegate candidates on the ballot, since such relief could be granted only "if one were to eliminate entirely the requirement of any petitions or signatures for the Dole-Robertson slates" a result that "would be exceedingly unfair to a candidate who engaged in the petition signature process"). Nevertheless, since no candidate objects, this equitable concern does not justify denying Mr. Keyes the relief he seeks.*

## SO ORDERED.

Molinari v. Powers, 82 F. Supp. 2d 57 (E.D.N.Y. 2000) is at the very heart of MURAWSKI'S claim that the name of Bill Murawski should be placed on the ballot.

Each federal, state, citywide and local election MURAWSKI entered into over the course of 5 or 6 years was to push obtaining paper ballots in New York State by running a write-in campaign. Each and every time the opportunity was presented by the Board of Elections to argue my point, the opportunity was ignored. However, during election year in 2017 there was no such invitation from the Board of Elections to argue the case and in the process, the Board of Elections violated MURAWSKI'S 5th Amendment Right of Due Process.

Another question could be raised by the Court is: "Should the name of Bill Murawski be placed on the ballot for mayor because he is internationally and locally known?

Bill Murawski is the producer of the award winning public access television show titled DeWitt Clinton Express – A Neighborhood News Program since 1995. With over 600 shows to his credit and for a good number of years, MURAWSKI used the credit time at the end of each show to urge voters to vote with a paper ballot despite having votes tabulated by mechanical voting machines. MURAWSKI'S initiative is believed to have assisted in obtaining paper ballots in New York State. Conduct a Google search with the following phrase: **Blinders UnMasked**. At the very end of the show at 24:17 the urge and recommendation to vote with a paper ballot for the purpose of protecting a person's right to vote begins.


Scott Stringer was the Assembly Member for the district in which MURAWSKI lived when then New York City Mayor Rudolph Giuliani decided to use DeWitt Clinton Park as the test case to privatize all local New York City Parks. It was not enough that Stringer stood idly by as the Giuliani administration proceeded with the plans but when it was decided to hand over the park to a known international career criminal such as Dieter Esch, Stringer, like then Manhattan Borough President Ruth Messinger, then city councilmember Tom Duane and his chief of staff Christine Quinn, and Congressman Jerold Nadler did nothing. In fact, MURAWSKI sent each of them a letter regarding the illegal and immoral privatization of the park asking for their support to stop it but no one responded either by mail or telephone. Not impressed with the lack of support from the elected officials who were allegedly supposed to represent MURAWSKI, MURAWSKI went off and produced his first public access television show and out-of-the-box MURAWSKI won an award from the Alliance of Community Media for his part in the 28 minute segment *Get Out of Our Park: The Birth of an Activist*, which was an embarrassment to all of the elected officials named.

When Scott Stringer went into playing The Musical Chair Business of New York City and was elected as Manhattan Borough President in 2005, and because the borough president in each borough controls their respective public access stations and their programming, Stringer had MURAWSKI'S prime time slot on Sundays that was opposite 60 Minutes, changed to Sunday afternoon at 3:00 when everyone is either coming home for church or watching Sunday football. To MURAWSKI'S knowledge, no other producer with a long-time running show as MURAWSKI had, had their programming time changed.

Although Stringer's action caused MURAWSKI to lose his entire following of fans as there was and still is not a way for having fans follow a show from one time slot to another in the public access world. Stringer's action led MURAWSKI to begin publishing a newspaper titled DeWitt Clinton Express – A Neighborhood Newspaper in July of 2013 and since the time of its birth, the "small but fierce newspaper" printed and distributed 36 issues totaling over 430,000 copies throughout the west side of Manhattan, Hell's Kitchen, Greenwich Village, Inwood and Harlem. And because of the distribution network designed and implemented by MURAWSKI, the DeWitt Clinton Express Neighborhood Newspaper is being read by people from over 80 different countries and with the publishing of its 4th Anniversary issue dated November 4, 2017, the newspaper will reach all ends of the universe as it will be the very first time the DeWitt Clinton Express will be publishing on the internet in real time. (See Appendix Page 38)

## Summary of the Argument

The argument is a simple one. MURAWSKI will prove beyond a shadow of a doubt that New York State is the most unconstitutional state in the union and at the source of the unconstitutionality is the Election Law of New York State and the twelve commissioners who control every aspect of elections.

MURAWSKI intends on making New York State the most constitutional state in the union.

Two examples of how elected officials hand pick their successors are demonstrated with former New York State Senator Tom Duane and former New York City Council member David Greenfield as follows:

a.  On the eve before petitioning would begin for gathering signatures for the Democratic Primary Election in 2012, Tom Duane decided to retire.  The name of Brad Hoylman, who was the Chair of Manhattan Community Board and a long-time ally of the former councilmember Duane and then State Senator, replaced the name of Tom Duane.  One openly gay person "crowned" his successor with another openly gay person.  Brad Hoylman went from Community Board Chair to that of the position of New York State Senator without even breaking a sweat.

b.  In 2017 Borough Park's David Greenfield, chairman of the City Council's Land Use Committee, announced today that he will not seek reelection because he is taking a job as head of the Metropolitan Council on Jewish Poverty.  His replacement on the ballot will  be his successor.

The methods for selecting a candidate of choice to become the "anointed one as described in the two instances as described above will never end with any change in the  in the New York State Election Law,  but the manipulation of the voting public could not be slicker than it was when a former 8 year little-known disheveled and do nothing councilmember, who followed with an uneventful 4 years as the public advocate,  was elected as The Mayor of New York City in 2013.  His name is Bill De Blasio.

It is a well-known fact that to win an election one must develop name recognition and to have a war chest filled with money.  There are 2 former New York City Public Advocates who were well-known and had money galore, who ran for mayor and lost: Betsy Gotbaum and Mark Green. Both had more name recognition and money than Bill de Blasio. So how did Bill de Blasio win? That's simple. It was in the long-term planning by the Clinton Machine, which began in 1992. (See Appendix Page 39)

Andrew Cuomo was the Secretary of HUD during the Clinton Administration. Bill de Blasio, then Warren Wilhelm, worked for Cuomo at HUD. U.S. Representative Charles Rangel tapped de Blasio to be his campaign manager for his successful 1994 re-election bid and in1997 de Blasio was appointed to serve as the regional director for the United States Department of Housing and Urban Development (HUD) for New York and New Jersey under the administration of President Bill Clinton. Bill de Blasio was the campaign manager for Hillary Clinton's successful run for U.S. Senate representing New York State in 2000 and as they say, the rest is history as the Clintons managed to have him elected as mayor of the city.

In 2006, as the United States Senator for New York State, Hillary Clinton managed to obtain $18 million dollars for the transformation of the abandoned High Line Railroad of yesteryear into a glorious park. Based upon information and belief, the action by Hillary Clinton was more than just "a nice thing to do" for the residents of Chelsea and Greenwich Village. It was also a research project to get to know who and what then Councilmember Christine Quinn was all about as Clinton knew she would need Quinn's support to become the first woman President of the United States as it was known in the political circles that Quinn was chomping at the bit to become the first woman to become the mayor of New York City.

In 2013 Christine Quinn was the odds-on favorite with a large margin to become the next mayor of New York City and the first woman to become mayor of the City of New York. And in came a Clinton operative whose sole purpose was to destroy the candidacy of Christine Quinn. The operative's name is none other than Anthony Weiner, husband of Huma Abedin who was Hillary Clinton's closest advisor, and who only 2 years prior to entering the race as a candidate for mayor was outed as a "sexter" and would up resigning his seat in Congress over the matter. After an explicit photo was leaked through the Twitter account of a listener of The Opie & Anthony Show, on June 16, 2011 Weiner announced that he would resign from Congress.

As a hard-nosed, quick thinking and astute politician, Weiner knew full well that he could not win the mayor's race in 2013 when it was only 2 years prior to the election that he was disgraced with his "sexting" episodes whereby he resigned from Congress in disgrace. Weiner only had one goal and objective in mind to focus on by entering the mayoral race in 2013 and that was to destroy the candidacy of Christine Quinn.

Weiner proceeded to destroy Quinn in the first debate and Quinn never quite recovered from the shellacking. But there was one more thing Hillary Clinton had to do to make it easy to have Bill de Blasio elected as the next mayor. Hillary Clinton is considered the Queen of Makeovers and she had quite a job to do in sprucing up

Bill de Blasio for the public to accept him as candidate for the position of mayor. Since there was nothing to begin with the conduct a makeover in the life of Bill de Blasio, Hillary Clinton had a job and a half ahead of her inventing a candidate who would be publicly acceptable.

# The Argument

There are 2 arguments to be made in MURAWSKI v. NYS BOARD OF ELECTIONS et al (CV 17 6859).

**Argument Number 1:** The Request for a Temporary Restraining Order is usually due to some sort of emergency, either real or imagined. It is up to the Court to determine if indeed the request if real and if so, act accordingly by issuing an order and if not, issue an order to deny the request.

The Request for a three judge panel is a matter of law. If Judge Sweet decided that a three judge panel is not required, then an order stating such should have been issued.

On two occasions, Judge Sweet ignored requests for Temporary Restraining Orders and he also ignored the request for a three judge panel, not once but twice. To add insult to an already injured plaintiff, when MURAWSKI attempted to have the pretrial conference in his hospital room, he was denied the request for a simple accommodation that should have come under the Americans with Disabilities Act of 1990.

MURAWSKI has been waiting since filing the original complaint on September 8, 2016 to be heard, which, Monday November 6th will make a total of 59 days!

The only thing that MURAWSKI asks is to let him have his say in the Second Circuit Court of Appeals for a few hours on Monday November 6th in the late afternoon and then have the circuit court make its decision either to stop the election and have the name of Bill Murawski put on the ballot for mayor of the City of New York as a Democrat and a candidate for the Voice of the People Party in the general election, or deny his request. It is that simple.

**Argument Number 2:** The Defendants may and will argue that it will be too expensive and a waste of taxpayer dollars to stop the election. On the contrary it would be a more expensive a financial burden not to stop it. If the election went on as planned, salaries to the poll workers would have to be paid, the packing up of the equipment and the recanvassing process would begin and a report would be produced showing the "official" results of the election. In the event the general election is not stopped as requested by MURAWSKI, assuredly MURAWSKI will appeal to the United States Supreme Court to re-run the election with the name of Bill Murawski on the ballot as a Democrat and the candidate for the independent party known as Voice of the People.

On September 11, 2001 there were less than 3,000 persons who lost their lives and with it their right to vote and the primary election was delayed for 14 days. Should

the Second District Court of Appeals decide not to stop the election and move ahead with it as planned, millions of people will lose their right to vote once again in the most unconstitutional state in the union.

# Conclusion

With the decision of Judge Korman in Molinari v. Powers, 82 F. Supp. 2d 57 (E.D.N.Y. 2000) led MURAWSKI to the idea of not having to submit one signature to get on the ballot in a primary election in New York State especially if no one challenges the signatures on the petitions submitted to which no one did in the petitions of MURAWSKI regarding the primary election. Therefore, once the name of Bill Murawski was placed on the ballot by the New York City Board of Elections, the name of Bill Murawski also should have been left "on the ballot" for the primary election and it was not.

Research on the matter in front of the Second Circuit Appeals Court of the United States led MURAWSKI to the case of Farmer v. Brennan, Warden et al 511 U.S. 825 (1994) where Justice Souter delivered the opinion of the Court. This case requires us to define the term "deliberate indifference," as we do by requiring a showing that the official was subjectively aware of the risk.

Citizens United v. Federal Election Commission 130 S.Ct. 876 (2010) used the idea of "deliberate indifference" to bring an issue into the spotlight in front of the United States Supreme Court that was clearly unconstitutional, much like MURAWSKI has experience over the years and now especially with Judge Sweet.

The only solution that would demonstrate any level of logic and or common sense is that the Second Circuit for the Court of Appeals is to order a decision to delay the general election for 2 weeks and place the name of Bill Murawski on the ballot as a Democrat and a candidate for the independent party named Voice of the People. Additionally, the the New York City Campaign Finance Board should publish Bill Murawski's information in the NYC Campaign Finance Board's Voter's Guide prior to the newly scheduled election. After all, MURAWSKI was placed on the ballot by the New York City Board of Elections and then was "kicked off the ballot" for lack of the number of signatures gathered upon which MURAWSKI claims and will prove to the Second Circuit of the U.S. Court of Appeals that the signature scheme designed and developed by 14 commissioners, is arbitrary and capricious. (See Appendix Pages 40 to 42)

Respectfully Submitted,

William Murawski, Pro-Se
Plaintiff-Appellant

EVELYN APRIL HAMMER
Notary Public, State of New York
No. 01HA6257725
Qualified in New York County
Commission Expires

April 10 22

Page 20

# Certificate of Compliance

I, William Murawski, certify that this brief contains 14,000 words or less.

EVELYN APRIL HAMMER
Notary Public, State of New York
No. 01HA6257725
Qualified in New York County
Commission Expires March 18, 2046

April 20, 22

# Appendix

Original Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Pages 1 to 5

Schedule of Pre-Trial Conference . . . . . . . . . . . . . . . . . . . . . . . Pages 6, 7

Acknowledgement of Motions to Dismiss . . . . . . . . . . . . . . . . Pages 8, 9

Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Pages 10 to 13

Murawski's Stay in Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14

Letter to Judge Sweet for Accomodation . . . . . . . . . . . . . . . . . Page 15 to 19

Three Judge Panel Requirements . . . . . . . . . . . . . . . . . . . . . . . Page 20

Abstracts from American Law and Economics Review . . . . . . . Pages 21, 22

New England Journal of Medicine Article  . . . . . . . . . . . . . . . Pages 23 to 31

Results of 2000 Presidential Election  . . . . . . . . . . . . . . . . . . . Pages 32, 33

Board of Elections Commissioners . . . . . . . . . . . . . . . . . . . . . . Pages 34, 35

Board of Elections Calendar for Presidential Election . . . . . . . Pages 36, 37

Front Page of Dewitt Clinton Express . . . . . . . . . . . . . . . . . . . Page 38

Article in DeWitt Clinton Express . . . . . . . . . . . . . . . . . . . . . . Page 39

Proof Bill Murawski was "On the Ballot" . . . . . . . . . . . . . . . .. Pages 40 to 42

JUDGE SWEET

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

WILLIAM  MURAWSKI aka and better known as
BILL MURAWSKI and all other candidates who are
similarly situated as the Plaintiff(s).

COMPLAINT

DOCKET# 17 CV _____

v.

NEW YORK STATE BOARD OF ELECTIONS, NEW
YORK CITY BOARD OF ELECTIONS and the NEW
YORK CITY CAMPAIGN FINANCE BOARD as the
Defendants.

**17 CV 6859**

RECEIVED
SEP 08 2017
U.S.D.C. S.D. N.Y.
CASHIERS

-------------------------------------------------------------------X

## I. JURISDICTION

The Federal District Court of the Southern District of New York has jurisdiction in the above captioned complaint because of violations of the 1st, 5th and 14th Amendments to the Constitution of the United States of America; 42 U.S. Code 42 § 1986; U.S. Code 42 § 1985 (3); and the Help America Vote Act (HAVA). The causes of action in the above captioned Complaint are explained in MURAWSKI'S affidavit and the Exhibits attached.

## II. PARTIES

A.  Plaintiff(s):

WILLIAM MURAWSKI aka and better known as BILL MURAWSKI filed with the NYCBOE as a candidate for Mayor of the City of New York in the Democratic Primary to be held on September 12, 2017 and in the General Election to be held on November 7, 2017. William MURAWSKI is a natural born citizen of the United States of America and lives at 530 West 50th Street in the Borough of Manhattan and has lived at that residence for more than thirty years.   The contact telephone number is (917) 407-6492; email address is Information@BillMurawski.com

"Similarly situated candidates" are those persons who filed with the NYCBOE to run for city-wide and local elective offices of the City of New York in the Primary Election to

**Appendix Page 1**

be held on September 12, 2017 and the General Election to be held on November 7, 2017 AND who have been "knocked off the ballot" as a result of the policies, procedures and rules of the NYSBOE and the NYCBOE.   Contact information is unknown.

### B. DEFENDANTS

The NEW YORK STATE BOARD OF ELECTIONS is located at   NYS BOARD OF ELECTIONS is located at 40 NORTH PEARL STREET, SUITE 5; ALBANY, NY 12207-2729; the contact telephone number is (518) 474-6220.

The NEW YORK CITY BOARD OF ELECTIONS is located at 32-42 Broadway, 7th Floor New York, NY 10004; the contact telephone number is (212) 487-5400.

The NEW YORK CITY CAMPAIGN FINANCE BOARD is located at 100 Church Street, 12th Floor, New York, NY 10007; the contact telephone number is (212) 409-1800.

1.   From this point hereon in, WILLIAM MURAWSKI will be referred to as "MURAWSKI"; the NEW YORK STATE BOARD OF ELECTIONS will be referred to as "the NYSBOE"; the NEW YORK CITY BOARD OF ELECTIONS will be referred to as "the NYCBOE"; and the NEW YORK CITY CAMPAIGN FINANCE BOARD will be referred to as "the FINANCE BOARD".

2.   MURAWSKI requests a three judge panel in accordance with 28 U.S. Code § 2284.

3.   New York City Council District 3 was gerrymandered against Murawski as a result of the 2000 U.S. Census.

4.   The signature scheme developed by the NYSBOE and NYCBOE is an arbitrary and capricious device used by political parties to eliminate persons from being placed "on the ballot" who seek to become public servants as elected officials.  Further, the current policies and procedures of the NYBOE and the NYCBOE allow for the political parties to maintain control of elective offices in New York State.

**Appendix Page 2**

5. The scheduling of primary elections by the NYSBOE and the NYCBOE violates the Equal Protection Clause of the 14th Amendment to the Constitution of the United States of America, hereinafter referred to "the Constitution".

6. The New York State Election Law violates the 1st Amendment right of the freedom of speech protected by the Constitution for those registered voters who are not enrolled in constituted political parties in the State of New York.

7. The New York State Election Law created an oligarchy in New York State and New York City. Instead of promoting and protecting the democratic process of electing representatives in a representative republic government, representatives are hand-picked by the major parties in the city and state.

8. MURAWSKI'S 1st Amendment and 14th Amendment rights protected by the Constitution have been violated by the NYCBOE and NYSBOE in city, state and local elections since 2001.

9. The NYCBOE violated MURAWSKI'S 5th and 14th Amendment protection of Due Process protected by the Constitution during the ballot access portion for attaining ballot access for the Democratic Primary that is planned to be held on September 12, 2017.

10. The NYCBOE violated MURAWSKI'S 1st Amendment right protected by the Constitution during the ballot access portion for attaining ballot access for the Democratic Primary that is planned to be held on September 12, 2017.

11. The Court is respectfully referred to Exhibit A paragraphs 1 to and including paragraph 76, which is a sworn affidavit submitted by MURAWSKI to support the allegations set forth in paragraphs 3 through 10 above.

12. The NYCBOE working in conjunction with, and is complicit with the FINANCE BOARD violates the Equal Protection Clause of the 14th Amendment to the Constitution and the Freedom of Speech protected by the 1st Amendment to the Constitution. The Court is respectfully referred to Exhibit A paragraphs 77 and 78, which is a sworn affidavit submitted by MURAWSKI to support this allegation.

**Appendix Page 3**

13. The NYCBOE violated the Help America Vote Act ("HAVA") in the 2013 city-wide elections. The Court is respectfully referred to Exhibit A paragraphs __ to __, which is a sworn affidavit submitted by MURAWSKI to support this allegation.

14. MURAWSKI'S Complaint is timely filed. All allegations of delays in the filing of MURAWSKI'S Complaint are baseless and are the direct result of the actions by thr NYCBOE. The Court is respectfully referred to paragraphs 70 through 75 in E hibit A, which is MURASKI'S sworn affidavit..

Relief:

**WHEREFORE**, MURAWSKI respectfully requests the following relie5f from the Court:

1. Place a Temporary Restraining Order ("TRO") on the Primary Elections to be held by the NYCBOE on September 12, 2017 until the following are accomplished:

   a. Place MURAWSKI'S name on the ballot as a candidate for Mayor in the Democratic Primary that is scheduled to be held on September 12, 2017.

   b. The publishing of MURAWSKI'S name as a candidate for Mayor in Primary Election in the FINANCE BOARD'S Voters Guide for the Primary Elections that are to be held on September 12, 2017.

   c. Order the NYCBOE to allow and inform those voters registered in New York City who are not enrolled in any political party be permitted to vote in the Primary Election to be held on September 12, 2017.

2. Place all candidates who have filed with the NYCBOE on the ballot in the Primary Election to be held on September 12, 2017 who are similarly situated as MURAWSKI.

3. Place MURAWSKI'S name on the ballot as a candidate for mayor in the General Election that is to be held on November 7, 2017 under the party name of Voice of the People.

4. Order the NYCBOE and the NYSBOE to develop a ballot access procedure such as a bond requirement that is financially reasonable for candidates to obtain ballot access that is not arbitrary.

**Appendix Page 4**

5. Order the NYCBOE and the NYSBOE to allow those voters who are not registered in any party to vote in all Primary Elections held in New York State.

6. Declare the 2013 election for mayor of the City of New York as null and void because of collusion and Constitutional violations set forth in MURAWSKI's Complaint.

7. Order the NYSBOE and the NYCBOE to have Primary Elections held in September to be held on any Tuesday in a week that is either before or after the yearly September 11th Commemoration because on September 11, 2001 both towers of the World Trade Center collapsed on the exact day that term limits were put into place for all elective offices in New York City, and as such, the healing process in New York City continues yearly every September 11th thereby distracting voters away from the Primary Elections.

8. Order the NYSBOE and the NYCBOE to schedule all primary elections for city, state and federal elections on the same day to comply with the Equal Protection Clause of the 14th Amendment to the Constitution, which is believed to also assist in saving the taxpayers approximately $9 million dollars that is spent yearly in overtime by the NYCBOE and the NYSBOE.

Respectfully,

William Murawski

September 8, 20wsq17

Sworn to before me th this
8th day of September 2017

EVELYN APRIL HAMMER
Notary Public, State of New York
No. 01HA6257725
Qualified in New York County
Commission Expires March 12, 2016

April 12 2020

**Appendix Page 5**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------

Murawski,

Plaintiff(s),

- against -

Defendant(s).

NYB of Elections, et al

PRETRIAL ORDER

17 civ. 6859 (RWS)

Sweet, D. J.

The above-entitled action has been assigned to Judge
Robert W. Sweet for all purposes. Counsel are directed to meet and
discuss settlement, pretrial discovery and all preliminary
matters. Interrogatories shall be served in accordance with Local
Rule 33.3. A letter application must be made for any interrogatory
sought under Rule 33.3(b). All documents produced in response to
request for documents pursuant to Rule 34, Fed. R. Civ. P. shall
be produced as maintained in the usual course of business or as
organized and labeled to correspond with categories requested.

If this action has been settled or otherwise terminated,
counsel are directed to file or mail a stipulation of
discontinuance, voluntary dismissal, or other proof of termination
of the action prior to the date of the pretrial conference with
Tsz Chan, Courtroom Clerk to Judge Sweet, Room 18C, U.S.
Courthouse, 500 Pearl Street, New York, New York 10007; otherwise
counsel are directed to appear in courtroom 18C on
Oct 10, 17 at 12 p.m. for a pretrial conference for
the purpose of discussing settlement with the court, exploring
contemplated motions, stating facts, arranging a plan and schedule
for all discovery, resolving any anticipated discovery issues, and
setting a time for trial. Plaintiff(s)' counsel ARE REQUIRED TO
NOTIFY COUNSEL FOR ALL PARTIES OF THIS CONFERENCE. Prior to the
appearance at the pretrial conference, all counsel appearing in
the action shall have exchanged discovery requests, either
formally or informally, and shall resolve or present all discovery
disputes.

If issue has not been joined and plaintiff(s)' counsel is unaware of the identity of defense counsel, plaintiff(s)' counsel is directed to appear at the conference EX PARTE; but if plaintiff(s)' counsel knows the identity of defense counsel, he is directed to mail a copy of this order to defense counsel forthwith.

It shall be the responsibility of the counsel now of record to show this order to the attorney appearing at the pretrial conference, trial counsel and any other attorney hereafter participating in this action. The attorney appearing at the pretrial conference must be authorized to enter into a settlement agreement and to make other appropriate stipulations.

This conference may not be adjourned without direction from the court. Failure to appear at the conference may result in termination of this action.

All mail and telephone calls concerning the calendar status of this action must be directed to the Courtroom Clerk. Any requests for interpreters must be made at least 24 hours in advance of the hearing at which such services are required by calling the Interpreters Office (805-0084).

Motions before Judge Sweet will be returnable at 12 noon on Thursday of each week pursuant to the notice published in the applications or requests for emergency relief must be arranged through the Courtroom Clerk.

The New York Law Journal will list actions on the trial calendar and the number of the courtroom in which Judge Sweet is sitting.

It is so ordered.

New York, N.Y.

9-26-17

_____
ROBERT W. SWEET
U.S.D.J.

**Appendix Page 7**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

WILLIAM MURAWSKI,

                Plaintiff,

     - against -

NEW YORK STATE BOARD OF ELECTIONS,
NEW YORK CITY BOARD OF ELECTIONS, and
the NEW YORK CITY CAMPAIGN FINANCE
BOARD,

                Defendants.

------------------------------------------X

17 Civ. 6859 (RWS)

O R D E R



Sweet, D.J.


       Defendants' Motion to Dismiss shall be taken on
submission on November 22, 2017. All papers shall be served in
accordance with Local Civil Rule 6.1.



       It is so ordered.


New York, NY
October 9 , 2017

                      ROBERT W. SWEET
                        U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

WILLIAM MURAWSKI,

             Plaintiff,

  - against -

NEW YORK STATE BOARD OF ELECTIONS,
NEW YORK CITY BOARD OF ELECTIONS, and
NEW YORK CITY CAMPAIGN FINANCE BOARD

               Defendants.

------------------------------------------

17 Civ. 6859 (RWS)

O R D E R

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 20
DATE FILED: 10/17/17
```

Sweet, D.J.

       Defendants' motion to dismiss shall be taken on submission on November 29, 2017. All papers shall be served in accordance with Local Civil Rule 6.1.

       It is so ordered.

New York, NY
October 17, 2017

                       ROBERT W. SWEET
                         U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

WILLIAM MURAWSKI aka and better known as          **AMENDED COMPLAINT**
BILL MURAWSKI and all other candidates who
are similarly situated as the Plaintiff(s).

                                                   **Civil Action No: 17 CV 6859**

-v.-

NEW YORK STATE BOARD OF ELECTIONS,
NEW YORK CITY BOARD OF ELECTIONS and
the NEW YORK CITY CAMPAIGN FINANCE
BOARD as the Defendants.

------------------------------------------X

## I. JURISDICTION

The Federal District Court of the Southern District of New York has jurisdiction in the above captioned complaint because of violations of the 1st, 5th and 14th Amendments to the Constitution of the United States of America; 42 U.S. Code 42 § 1986; U.S. Code 42 § 1985 (3); and the Help America Vote Act (HAVA). The causes of action in the above captioned Amended Complaint are explained in MURAWSKI'S affidavit and the Exhibits included with this Amended Complaint.

## II. PARTIES

A. Plaintiff(s):

WILLIAM MURAWSKI aka and better known as BILL MURAWSKI filed with the NYCBOE as a candidate for Mayor of the City of New York in the Democratic Primary to be held on September 12, 2017 and in the General Election to be held on November 7, 2017. William MURAWSKI is a natural born citizen of the United States of America and lives at 530 West 50th Street in the Borough of Manhattan and has lived at that residence for more than thirty years. The contact telephone number for WILLIAM MURAWSKI is (917) 407-6492; email address is Information@BillMurawski.com

"Similarly situated candidates" are those persons who filed with the NYCBOE to run for city-wide and local elective offices of the City of New York and filed petitions to run in the Primary Election that were held on September 12, 2017 and who were "'knocked off the ballot" as a result of the policies, procedures and rules of the NYSBOE and the NYCBOE. Contact information is unknown.

**Appendix Page 10**

B. Defendants

The NEW YORK STATE BOARD OF ELECTIONS is located at 40 NORTH PEARL STREET, SUITE 5; ALBANY, NY 122072729; the contact telephone number is (518) 474-6220.

The NEW YORK CITY BOARD OF ELECTIONS is located at 32-42 Broadway, 7th Floor New York, NY 10004; the contact telephone number is (212) 487-5400.

The NEW YORK CITY CAMPAIGN FINANCE BOARD is located at 100 Church Street, 12th Floor, New York, NY 10007; the contact telephone number is (212) 409-1800.

1. From this point hereon in, WILLIAM MURAWSKI will be referred to as "MURAWSKI"; the NEW YORK STATE BOARD OF ELECTIONS will be referred to as "the NYSBOE"; the NEW YORK CITY BOARD OF ELECTIONS will be referred to as "the NYCBOE"; and the NEW YORK CITY CAMPAIGN FINANCE BOARD will be referred to as "the FINANCE BOARD".

2. MURAWSKI requests a three judge panel in accordance with 28 U.S. Code § 2284. New York City Council District 3 was gerrymandered against Murawski as a result of the 2000 U.S. Census.

3. The signature scheme developed by the NYSBOE and NYCBOE is an arbitrary and capricious device used by political parties to eliminate persons from being placed "on the ballot" who seek to become public servants as elected officials. Further, the current policies and procedures of the NYBOE and the NYCBOE allow for the political parties to maintain control of elective offices in New York State.

4. The scheduling of primary elections by the NYSBOE and the NYCBOE violates the Equal Protection Clause of the 14th Amendment to the Constitution of the United States of America, hereinafter referred to "the Constitution".

5. The New York State Election Law violates the 1st Amendment right of the freedom of speech protected by the Constitution for those registered voters who are not enrolled in constituted political parties in the State of New York.

6. The New York State Election Law created an oligarchy in New York State and New York City. Instead of promoting and protecting the democratic process of electing representatives in a representative republic government, representatives are hand-picked by the major parties in the city and state.

7. MURAWSKI'S 1st Amendment and 14th Amendment rights protected by the Constitution have been violated by the NYCBOE and NYSBOE in city, state and local elections since 2001.

**Appendix Page 11**

8. The NYCBOE violated MURAWSKI'S 5th and 14th Amendment protection of Due Process protected by the Constitution during the ballot access portion for attaining ballot access for the Democratic Primary that was held on September 12, 2017.

9. The NYCBOE violated MURAWSKI'S 1st Amendment right protected by the Constitution during the ballot access portion for attaining ballot access for the Democratic Primary that was held on September 12, 2017.

10. The Court is respectfully referred to Exhibit A paragraphs 1 to and including paragraph 83, which is a sworn affidavit submitted by MURAWSKI to support the allegations set forth in paragraphs 2 through 9 above.

11. The NYCBOE working in conjunction with, and is complicit with the FINANCE BOARD violates the Equal Protection Clause of the 14th Amendment to the Constitution and the Freedom of Speech protected by the 1st Amendment to the Constitution. The Court is respectfully referred to Exhibit A paragraphs 84 and 85, which is a sworn affidavit submitted by MURAWSKI to support this allegation.

12. The NYCBOE violated the Help America Vote Act ("HAVA") in the 2013 city-wide elections. The Court is respectfully referred to Exhibit A paragraphs 86, which is a sworn affidavit submitted by MURAWSKI to support this allegation.

13. MURAWSKI'S Complaint is timely filed.

14. The entirety of the sworn affidavit submitted by MURAWSKI as Exhibit A is to be considered by the Court in granting the relief requested by MURAWSKI.

**WHEREFORE,** MURAWSKI respectfully requests the following relief from the Court:

1. Re-run the Primary Elections held in New York City on September 12, 2017 and place MURAWSKI's name as a candidate for Mayor of the City of New York in the Democratic Primary and place the names of all similarly situated candidates on the ballot in their respective parties for the following reasons:
   a. Due Process Violations against MURAWSKI and;
   b. The signature schemes developed and implemented by the NYSBOE and the NYCBOE are unconstitutional

2. Place a Temporary Restraining Order ("TRO") on the General Election in New York City to be held by the NYCBOE on November 7, 2017 until the following are accomplished:
   a. Place MURAWSKI'S name on the ballot for the Voice of the People Party as a candidate for Mayor of New York City in the General Election that is scheduled to be held on November 7, 2017;
   b. Publish MURAWSKI'S name in the FINANCE BOARD'S Voters Guide for the Voice of the People Party (in its entirety) in the General Election for Mayor of the City of New York that is to be held on November 7, 2017.

3. Order the NYCBOE and the NYSBOE to develop a ballot access procedure such as a bond requirement that is financially reasonable for candidates to obtain ballot access that is not arbitrary and capricious.

4. Order the NYCBOE and the NYSBOE to allow those voters who are not registered in any constituted party to vote in all Primary Elections held in New York State.

5. Declare the 2013 election for mayor of the City of New York as null and void because of collusion and Constitutional violations set forth in MURAWSKI's Complaint.

6. Order the NYSBOE and the NYCBOE to have Primary Elections held in September to be held on any Tuesday in a week that is either before or after the yearly September 11th Commemoration because on September 11, 2001 both towers of the World Trade Center collapsed on the exact day that term limits were put into place for all elective offices in New York City, and as such, the healing process in New York City continues yearly every September 11th thereby distracting voters away from the Primary Elections.

7. Order the NYSBOE and the NYCBOE to schedule all primary elections for city, state and federal elections on the same day to comply with the Equal Protection Clause of the 14th Amendment to the Constitution, which is believed to also assist in saving the taxpayers approximately $9 million dollars that is spent yearly in overtime by the NYCBOE and the NYSBOE.

8. Order the NYSBOE and the NYCBOE to develop a method within a 3 year period whereby voters can obtain a paper receipt for the ballot they cast in any election held in New York State AND that the voter can verify on the internet that all votes cast on the ballot were counted.

9. Order the Board of Elections to develop a method whereby a third, non-interested party such as the League of Women Voters can verify the votes cast in any election held in New York State.

10. Any other relief the Court deems just and proper in favor of the voters of New York State.

Respectfully,

William Murawski

EVELYN APRIL HAMMER
Notary Public, State of New York
No. 01HA6257725
Qualified in New York County
Commission Expires March 18, 2018
April 2, 2020

Sworn to before me on this 22nd day of September 2017

**Appendix Page 13**

# New York-Presbyterian
## Weill Cornell Medical Center
525 East 68th Street • New York, NY 10065

## EXITCARE® PATIENT INFORMATION

Patient Name: <u>WILLIAM MARAWSKI</u>
Attending Caregiver: <u>Bessey, Palmer</u>

# Excuse from Work, School, or Physical Activity

<u>WILLIAM MARAWSKI</u> needs to be excused from:

☑ Work

☑ School

☑ Physical activity

Beginning 09/29/2017 and through the following date: <u>10/17/2017</u> while being treated as an inpatient.

Caregiver's signature: _____ Maria Dominguez, MD

Date: October 16, 2017

Document Released: 6/13/2002 Document Revised: 3/11/2013 Document Reviewed: 7/20/2015
ExitCare® Patient Information ©2015 ExitCare, LLC. This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

2017-057-02165

**Appendix Page 14**

## Transmission Report

Date/Time    10-16-2017    09:43:44    Transmit Header Text
Local ID 1    2127466651    Local Name 1

### This document : Confirmed
### (reduced sample and details below)
### Document size : 8.5"x11"

TO: JUDGE SWEET    FROM. WILLIAM MURAWSKI
FEDERAL COURT    530 W. 50TH ST
SOUTHERN DISTRICT OF NY    NY, NY 10019
500 PEARL ST
NEW YORK, NY.    RE: CV 17 6859

VIA FACSIMILE (212) 805-7925

OCTOBER 16, 2017

JUDGE SWEET,

I HAVE BEEN RECUPERATING FROM 2nd AND 3rd
DEGREE BURNS RECEIVED FROM A FIRE IN MY APARTMENT
KITCHEN ON SEPTEMBER 29, 2017. IT IS EXPECTED I
WILL BE RELEASED HOME LATER THIS WEEK.

THEREFORE, IN THE INTEREST OF JUSTICE AND TIME
(I REQUESTED A TRO ON GENERAL ELECTION TO BE HELD
ON NOVEMBER 7, 2017) I AM REQUESTING THE PRELIMINARY
CONFERENCE SCHEDULED FOR TOMORROW OCT 17TH, BE HELD
IN MY HOSPITAL ROOM. I AM IN THE NEW YORK
PRESBITERIAN - CORNELL - WEILL HOSPITAL BURN
UNIT ROOM 8-4N. THE HOSPITAL HAS MY NAME
SPELLED AS "MARAWSKI"

YOU SHOULD ALSO BE AWARE THAT MY LANDLORD
HAS LOCKED ME OUT OF MY APARTMENT THUS

Total Pages Scanned : 4      Total Pages Confirmed : 4

| No. | Job | Remote Station | Start Time | Pages | Line | Mode | Job Type | Results |
|-----|-----|----------------|------------|-------|------|------|----------|---------|
| 001 | 217 | 912128057925 | 09:42:28 10- | | 1 | EC | HS | CP28800 |

**Appendix Page 15**

Abbreviations:
HS: Host send    PL: Polled local    MP: Mailbox print    CP: Completed    TS: Terminated by system
HR: Host receive    PR: Polled remote    RP: Report    FA: Fail    G3: Group 3
WS: Waiting send    MS: Mailbox save    FF: Fax Forward    TU: Terminated by user    EC: Error Correct

To: JUDGE SWEET                    FROM: WILLIAM MURAWSKI,
FEDERAL COURT                      530 W. 50th ST
SOUTHERN DISTRICT OF NY            NY, NY 10019
500 PEARL ST
NEW YORK, NY.          RE: CV 17 6859

          VIA FACSIMILE (212) 805-7925

OCTOBER 16, 2017

JUDGE SWEET:

I HAVE BEEN RECUPERATING FROM 2nd and 3rd
DEGREE BURNS RECEIVED FROM A FIRE IN MY APARTMENT
KITCHEN ON SEPTEMBER 29, 2017. IT IS EXPECTED I
WILL BE RELEASED HOME LATER THIS WEEK.

THEREFORE, IN THE INTEREST OF JUSTICE AND TIME
(I REQUESTED A TRO ON GENERAL ELECTION TO BE HELD
ON NOVEMBER 7, 2017) I AM REQUESTING THE PRELIMINARY
CONFERENCE SCHEDULED FOR TOMORROW OCT 17th, BE HELD
IN MY HOSPITAL ROOM. I AM IN THE NEW YORK
PRESBITERIAN - CORNELL - WEILL HOSPITAL BURN
UNIT ROOM 8-424. THE HOSPITAL HAS MY NAME
SPELLED AS "MARAWSKI".

**Appendix Page 16**

YOU SHOULD ALSO BE AWARE THAT MY LANDLORD
HAS LOCKED ME OUT OF MY APARTMENT THUS

PAGE 2

PREVENTING ME ACCESS TO MY RESEARCH AND
EVIDENCE THAT IS REQUIRED TO PROSECUTE
MY CASE. PLEASE SEE 2 PAGE LETTER FROM
MY ATTORNEY ATTACHED.

THANK YOU IN ADVANCE FOR YOUR ANTICIPATED
COOPERATION IN THIS MATTER.

YOURS TRULY,

*William Murawski*

(917) 407-6492

**Appendix Page 17**

LAW OFFICE OF
## JAY STUART DANKBERG
1220 Broadway
Suite 502
New York, New York 10001-4312
Tel:  (212) 967-1114          *Fax: (212) 967-1112

Jay Stuart Dankberg
*(Judge, Civil Court, Ret.)*

*Not for service of
litigation papers;
No e-mail accepted

October 11, 2017

Double B. Realty LLC
Richard Bisso President
150 Myrtle Avenue, Suite 2
Brooklyn, NY 11201

Re:     *William Murawski and Evelyn Hammer*
        *530 West 50th Street Apt 5A*
        *New York, New York 10019*

Dear Mr. Bisso:

As you are aware, this office represents William Murawski and Evelyn Hammer.

On Friday September 29 at 1:30 AM, Apartment 5A was suddenly engulfed in a fire.

I am advised that the fire caused Mr. Murawski to incur severe and painful 2nd and 3rd degree burns and will require skin grafts to several parts of his body.

Injuries from the fie are believed to be permanent.

After the Fire Department left the premises, it was discovered that someone had padlocked the apartment door to Apartment 5A, preventing access to recover needed medication and, personal possessions of Mr. Murawski and Ms. Hammer (his domestic partner).

My office contacted your attorney, Jonathan Schreiber, Esq. (Bora Goldstein, *et al.*) He advised me you/your managing agent padlocked Mr. Murawski's apartment "due to FDNY investigation".

The statement about a FDNY investigation" is believed to not be accurate.

My office has contacted both the FDNY and NYPD we were told as neither the FDNY or the NYPD had placed a door seal on the apartment door, neither the Fire nor Police Departments padlocked the apartment.

Please advise when someone from my office can receive the key(s) to the padlock and gain needed access.

If the padlock keys and unfettered access are not provided by Friday at 5 PM, October 13, 2017, an "illegal lockout" proceeding will be filed with the Civil Court.  Any locksmith and

**Appendix Page 18**

attorney related expenses will be requested to be billed to you/your company.

This letter is also to advise that Mr. Murawski and Ms. Hammer are considering filing a civil lawsuit for damages resulting from the fire due to negligence of you/your companies. **As Mr. Murawski and/or Ms. Hammer many time advised you, you are aware that the last time your worker(s) painted Apartment 5A (over five years ago), they** <u>failed to replace and/or re-install working smoke detectors</u>**. As an owner of a multiple dwelling in the City of New York, you are no doubt aware (or should be aware in the exercise of reasonable management of a multiple dwelling) that the lack of working smoke detectors is a violation of the fire laws in New York.**

**If working smoke detectors had been installed, the severity of the fire would have been minimal at best. Now Mr. Murawski is recovering from second and third degree burns, will require a skin graft and will have permanent injuries due to your negligence.**

Thus, if you have not already done so, it is suggested that you notify your insurance carrier in this regard. Of course, the carrier can contact me as soon as reasonably possible.

Please advise as to access ASAP.

Please write with any comments or questions in this or any other regard. <u>If you authorize it in writing</u>, please advise me to whom to notify any attorney, insurance carrier or other person or company in this respect.

Thank you in advance for your anticipated courtesy and cooperation.

Very truly yours,
LAW OFFICE OF JAY STUART DANKBERG

By Jay Stuart Dankberg

jsd: eh
cc:    William Murawski and Evelyn Hammer

**Appendix Page 19**

Case 1:17-cv-06859-RWS    Document 21-1    Filed 11/06/17    Page 43 of 74

Cornell Law School

U.S. Code › Title 28 › Part VI › Chapter 155 › § 2284

# 28 U.S. Code § 2284 - Three-judge court; when required; composition; procedure

**(a)** A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

**(b)** In any action required to be heard and determined by a district court of three judges under subsection (a) of this section, the composition and procedure of the court shall be as follows:

**(1)** Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. The judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding.

**(2)** If the action is against a State, or officer or agency thereof, at least five days' notice of hearing of the action shall be given by registered or certified mail to the Governor and attorney general of the State.

**(3)** A single judge may conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure except as provided in this subsection. He may grant a temporary restraining order on a specific finding, based on evidence submitted, that specified irreparable damage will result if the order is not granted, which order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction. A single judge shall not appoint a master, or order a reference, or hear and determine any application for a preliminary or permanent injunction or motion to vacate such an injunction, or enter judgment on the merits. Any action of a single judge may be reviewed by the full court at any time before final judgment.

(June 25, 1948, ch. 646, 62 Stat. 968; Pub. L. 86–507, § 1(19), June 11, 1960, 74 Stat. 201; Pub. L. 94–381, § 3, Aug. 12, 1976, 90 Stat. 1119; Pub. L. 98–620, title IV, § 402(29)(E), Nov. 8, 1984, 98 Stat. 3359.)

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

**Pensions, Politics, and Judicial Tenure: An Empirical Study of Federal Judges, 1869–2002** by Albert Yoon. Published: American Law and Economics Review, Volume 8, Issue 1, 1 March 2006, Pages 143–180,

**Abstract:** When Article III judges conclude active service, they effectively abdicate their seat and enable the president and Senate to select a successor. Some judicial scholars have concluded that political factors—both within and across institutions—largely influence this decision. Analyzing judicial turnover, year by year, this article finds that judges have increasingly synchronized their departure from active service with qualifying for their judicial pension. By comparison, political and institutional factors appear to have little influence on turnover rates. These findings contradict much of the existing scholarship on judicial turnover and also offer more viable alternatives for judicial reform.

**A Theory of Justices' Retirement** by Álvaro Bustos Tonja Jacobi Published: American Law and Economics Review, Volume 17, Issue 2, 1 December 2015, Pages 529–565

**Abstract:** This paper introduces a formal model of Supreme Court retirement, in which the justices, the President and the Senate are rational agents who aim to shift the median ideology of the Court as close as possible to their own ideologies. The model shows that the probability of retirement depends on a set of personal, contextual, and political variables. It provides a rigorous theory for the effect of extant variables, and identifies variables that have not previously been fully appreciated. In particular, it shows the impact of the ideologies of the non-retiring justices and whether the ideology of the retiring justice is moderate or extreme. This more complete explanation of strategic judicial retirements raises empirically testable predictions to differentiate among the disparate findings of the existing literature.

**The Political Ideologies of Law Clerks** by Adam Bonica Adam S. Chilton Jacob Goldin Kyle Rozema Maya Sen. Published: American Law and Economics Review, Volume 19, Issue 1, 1 April 2017, Pages 96–128 Published: 13 September 2016

**Abstract:** In order to study the political ideologies of judicial law clerks in the United States, we construct a novel dataset that combines information on the identity of clerks with a measure of political ideology based on political donations.

We then use this data to empirically investigate several important questions about the ideologies of clerks. First, we examine whether clerks tend to share the liberal ideology of other lawyers or the more conservative ideology associated with federal judges and find that clerks tend to be disproportionately liberal. Second, we investigate how the ideologies of clerks compares to the ideologies of lawyers and find that liberal lawyers are more likely to have clerked than conservatives. Third, we assess whether the ideologies of clerks differs based on the level of clerkship and find that the liberal skew becomes less pronounced as the prestige of the clerkship increases. **Fourth, we analyze the relationship between ideology and the hiring of clerks and find that the ideology of judges is strongly correlated with the ideology of their clerks.**

**Age, Neuropathology, and Dementia** by George M. Savva, Ph.D., Stephen B. Wharton, F.R.C.Path., Paul G. Ince, M.D., Gillian Forster, B.Sc., Fiona E. Matthews, Ph.D., and Carol Brayne, M.D., for the Medical Research Council Cognitive Function and Aging Study. Published New England Journal of Medicine 2009; May 28, 2009; 360:2302-2309

During the 20th century, interest in the dementias focused on specific disorders defined by criteria that were developed for patients who had onset of dementia before the age of 65 years, which had come to be considered by many as pathologically distinct from late-onset dementia.[1] In the second half of that century, the distinction between early-onset and late-onset dementias was challenged by the realization that the hallmarks of Alzheimer's disease in older persons were indistinguishable from those in younger persons with Alzheimer's disease. Population epidemiologic studies of dementia have revealed a relentless rise in the incidence of dementia into old age, and clinically diagnosed Alzheimer's disease is considered to be the major subtype of dementia. The role of Alzheimer's disease in very old persons has become less clear since the contribution of vascular and other pathological changes has been recognized.

Research in dementia is driven by the expectation that understanding the genetic and molecular findings underlying clinical subtypes of dementia will result in major prevention strategies for the whole population. The greatest demographic change is the increasing number of persons over 85 years of age, in whom most cases of dementia will occur. It is therefore important to know whether research findings in younger old persons, often in tertiary research settings, are relevant to older old persons in the population. Only a small number of brain-donation programs are linked to longitudinal, population-based studies of aging. Programs that have included persons in the oldest age groups consistently show that these persons have mixed neuropathological features and that those who die in their 80s and 90s may have pathological features of Alzheimer's disease without a diagnosis of dementia during life. Current diagnostic criteria that seek to define Alzheimer's disease, vascular dementia, and Lewy body dementia may not apply as well to the oldest old as to the younger old, in whom they were generated.

The relationship between underlying biology and clinical phenotype in the oldest old merits further examination, because current diagnosis, treatment, and management are predominantly shaped by research based on the younger old. Here we explore the effect of age on the relationship between the classic

neuropathological features of dementia and the clinical manifestation of dementia in a population-based cohort of the elderly.

## Methods

### Population Selection and Interview Phases

The Medical Research Council Cognitive Function and Ageing Study (CFAS) is a multicenter, prospective, population-based study of older people in the United Kingdom. The study design and data on the prevalence and incidence of dementia have been previously reported and have been used in the development of international and national policies on dementia. The population base used was derived from lists of primary care physicians in specific geographic areas that included institutions that cared for elderly people. In five urban and rural centers in England and Wales, random samples of approximately 2500 persons aged 64 years or older underwent a screening interview that included the Mini–Mental State Examination (MMSE) and the Geriatric Mental State–Automated Geriatric Examination for Computer Assisted Taxonomy (GMS-AGECAT) items related to organic disorders. The response rate was 82%. Detailed assessment was conducted in a subsample of approximately 20% of subjects stratified according to the MMSE and the AGECAT organicity scores. The screening and assessment process was repeated after 2 years, and a further 20% of those not previously included were added to the assessment group. This assessment group was followed up again 6 years after baseline, and the entire remaining cohort was assessed 10 years after baseline. Additional interviews at 1, 3, and 8 years were conducted in samples of the assessment group. In a sixth center, 5200 people underwent similar assessments at baseline, 1 or 2 years, 3 or 4 years, 5 or 6 years, 8 years, and 10 years.

Those who took part in assessment interviews were asked whether they and their families were willing to consider brain donation after the respondent's death. The analysis presented here was based on 456 brains donated up to July 2004 (data set version 3.1).

## Diagnosis of Dementia

Dementia status at death was determined on the basis of all information available for each respondent. This information was based on interviews during the last years of life, including the full GMS-AGECAT diagnostic algorithm that was equivalent to that in the Diagnostic and Statistical Manual of Mental Disorders, third edition, revised (DSM-III-R), interviews with informants after the respondent's death when

this was possible, and death certification. Dementia was diagnosed before death in 243 of the 456 respondents, and 183 were determined not to have dementia. Sufficient information for a diagnosis of dementia was not available for an additional 30 respondents, who were excluded from the analysis. The approach to the diagnosis of dementia in the CFAS is described in the Supplementary Appendix, available with the full text of this article at NEJM.org.

### Neuropathological Assessment

Assessment by neuropathologists who were unaware of all clinical data was conducted according to a modified Consortium to Establish a Registry for Alzheimer's Disease (CERAD) protocol (www.cfas.ac.uk). Neuropathological lesions of Alzheimer's disease, diffuse plaques, neuritic plaques, and neurofibrillary tangles in the entorhinal, hippocampal, frontal, temporal, parietal, and occipital cortexes were classified into four categories (none, mild, moderate, and severe). Cortical atrophy was assessed macroscopically in each brain area, without knowledge of microscopical findings, and classified as absent, mild, moderate, or severe. Lewy bodies and hemorrhages, regional infarcts (>1 cm in diameter), and small-vessel disease (severe arteriosclerosis, lacunes, microinfarcts, or severe white-matter attenuation) were scored according to the CERAD protocol. Some subjects had more than one of the vascular pathological changes that were assessed. Inter-rater reliability for cerebral atrophy, tangles, plaques, Lewy bodies, and amyloid angiopathy was validated among contributing pathologists at the beginning of the study by circulating photographs of macroscopic findings and slides of microscopical findings.

### Statistical Analysis

Variables were dichotomized so that moderate and severe scores were considered to represent a significant burden of pathological lesions, as compared with no score and mild scores, which represented no burden or a low burden. In accordance with the CERAD protocol, maximum neocortical scores for each lesion and for atrophy were used. Logistic regression was used to model the effect of age on the relationship between neuropathological lesions and dementia. Each dichotomized pathological indicator was considered as an outcome, and the effects of age and dementia and their interaction were included in the model. Age at death was modeled as a continuous variable to estimate the association between pathology and dementia at different ages and to test for interactions. For analysis

**Appendix Page 25**

of the relationship between the prevalence of lesions and dementia at death, the subjects were divided into five age groups: under 80, 80 to 84, 85 to 89, 90 to 94, and over 94 years of age.

Sensitivity analyses were conducted for the effects of potential confounders. These analyses included sex, level of education, social class, time since last interview, and center, as well as the interaction of each of these with dementia. Further analyses included only those participants who received an assessment 1 year before death and excluded all those with prevalent dementia at baseline.

### Results

### Sample Characteristics

The sex, age, and dementia status of the members of the cohort at death are given in Table 1 Characteristics of the Respondents According to Age at Death.. More than 63% of donors were 85 years of age or older at death; 59% were women. Among those who had not received a diagnosis of dementia, there was no significant association between age and MMSE score at the most recent assessment before death. Among those who died with dementia, the MMSE score was lower (indicating poorer function) in the older groups. The time since the last interview was similar in all age groups. Among those who died without dementia, the causes of death were similar in those who had an autopsy and those who did not (the cause of death was cancer in 23% and 24% of respondents, respectively, and cardiovascular disease in 45% and 44%).

### Age and Alzheimer's Disease–Type Pathological Lesions

The distribution of each pathological lesion according to age group and dementia status is shown in Table 1 in the Supplementary Appendix. The modeled and observed prevalence rates of pathological changes are shown in Figure 1 Modeled and Observed Prevalence of Moderate or Severe Pathological Lesions According to Age. Among persons without dementia, the prevalence of moderate or severe neuritic plaques and of neurofibrillary tangles in each area increased with increasing age at death. The prevalence of these pathological changes in those who died with dementia either remained constant or tended to decline with age. Consequently, the difference in the burden of pathological lesions between persons who died with and those who died without dementia was less in those who died at older ages. In contrast, the prevalence of cortical atrophy was higher at all ages among those who died with dementia than among those who died without dementia.

The association between pathological lesions and dementia, as estimated by our regression model, was compared in persons who died at 75 years of age and in those who died at 95 years of age (Table 2 Odds Ratios for the Association between Neuropathological Features and Dementia at Death, Modeled at the Ages of 75 and 95 Years.). These ages were selected in the model for comparison between younger and older persons. Atrophy of the hippocampus and the neocortex was strongly associated with dementia at all ages. Neuritic plaques and neurofibrillary tangles were strongly associated with dementia at 75 years of age, but the association was less strong at 95 years. This difference between the younger old and the older old was observed for both the hippocampus and the neocortex, although the effect was less striking for neocortical neurofibrillary tangles. Diffuse plaques were less strongly associated with dementia than were neuritic plaques at the age of 75 years, but by the age of 95 years these two neuropathological changes showed a similar association with dementia. Adjustment for demographic factors and inclusion only of participants who received a diagnosis of dementia close to death did not alter our findings (see Table 2 in the Supplementary Appendix).

### Vascular Pathological Features and Lewy Bodies

Small-vessel disease, infarcts, and the presence of more than one vascular pathological change were associated with dementia in the younger old. These associations were less pronounced in the older old, but the effect of age on the association was not significant. Lewy bodies were identified in 24 persons, 21 of whom were diagnosed with dementia, with no evidence of an association with age.

### Discussion

This cohort-based study has sufficient power to model the pathological changes associated with dementia across the age range from 70 to 100 years. Using a careful definition of dementia status before death, we found that the relationship between the clinical manifestations of dementia and underlying neuropathological findings varies with age within this population-based cohort of brain donors. Our study confirms earlier reports of considerable overlap in the burden of neuropathological features of Alzheimer's disease between groups of the oldest old persons with dementia and those without dementia. In those dying without dementia, we confirm that the burden of Alzheimer's-type disease in the population increases with increasing age at death. In contrast, cortical atrophy remains strongly associated with dementia in all age groups.

The use of the primary care system registry of the United Kingdom ensured that the entire population in the areas chosen, including persons living in institutions, served as the basis for selection of the sample. The response rate at baseline was high, and all follow-up activity was assessed for potential bias due to attrition. The response rate among those who agreed to brain donation was high, considering the sensitive nature of this work, and has been scrutinized to exclude bias.10 The selection of persons to be interviewed for assessment of dementia, from whom the donor cohort was derived, was weighted toward the cognitively impaired, but no further bias in the donation process has been detected. Abrupt terminal decline could potentially affect our findings, but the diagnostic method makes it unlikely that this would have led to an inaccurate diagnosis of dementia. The 30 respondents for whom the diagnosis of dementia was doubtful were excluded from the analysis. The method for diagnosing dementia has been validated and is used widely in different settings. The assessment of dementia from informant reports was based on the DSM-III-R, an approach supported by the previous validation studies performed with the use of the GMS-AGECAT instrument.

If our findings were artifacts due to misclassification of persons with regard to dementia status, such misclassification would have to be differentially associated with age. It could be argued that extremely old persons might receive a diagnosis of dementia because of a greater prevalence of impairments, including vision and hearing, but the interviews take these possibilities into account. The severity of dementia also does not explain the convergence of neuropathological profiles at older ages in persons with and those without dementia, since the MMSE scores of those who died with and those who died without dementia appear to diverge slightly with increasing age. None of the sensitivity analyses led to different conclusions, a result suggesting that neither demographic factors nor the study design can explain our findings.

The neuropathological assessment was based on a modified CERAD protocol. We retained this basic assessment during the whole study to generate consistent data. The CERAD assessment relied on hematoxylin and eosin or ubiquitin staining to identify Lewy bodies; therefore, although our findings are robust, they need further confirmation with current techniques of staining.

Among those persons who died with dementia, the distribution of Alzheimer's-type pathological features remained roughly constant with increasing age, and consequently there was a decline in the association between the burden of

Alzheimer's-type pathological features and dementia. With increasing age, there is a decrease in the ability to predict dementia on the basis of the burden of neuritic plaques in the hippocampus and neocortex and of neurofibrillary tangles in the hippocampus. Neuropathological validation of the diagnosis of Alzheimer's disease, based on confirmation of the presence of these changes, has a different meaning in the oldest old, because that same burden of pathological features may frequently be found in persons of the same age who do not have dementia. The association between neocortical neurofibrillary tangles and dementia during life remains strong at all ages, although the association is somewhat attenuated at increased ages. Previous studies support the idea of a convergence of Alzheimer's-type pathological features in people with and in those without dementia at very advanced ages: older persons with dementia have fewer Alzheimer's-type pathological features at death than do younger persons with dementia, indexes of cholinergic innervations converge between persons with and those without dementia at advanced ages, and the relationship between Alzheimer's-type pathological features and dementia is clearest in the younger old.

These results suggest that additional factors determine the clinical expression of dementia in the oldest old. Hypothetically, these might include varying tolerance to neuropathological lesions; varying speed of lesion development, allowing compensatory processes; and interaction with coexisting illnesses. Neuronal and synaptic loss may represent an integral final common pathway mediating the effects of such factors. We found that cortical atrophy increases with age and continues to differentiate persons with dementia from those without dementia in all age groups, a finding echoing much earlier observations. Atrophy, a feature commonly seen on neuroimaging, emerges as a robust marker of the accumulation of pathological lesions and the failure of compensatory mechanisms, both of which lead to dementia. Atrophy reflects both Alzheimer's-type pathological changes and other factors, such as loss of neurons, axodendritic pruning, and reduced synaptic density, that occur in the course of normal aging and are a correlate of dementia. Perhaps if life span were sufficiently prolonged in some persons, aging changes in the brain, such as synaptic loss, could result in dementia without substantial Alzheimer's-type pathological changes.

Mixed pathologic factors are common in the older brain and contribute to dementia and cognitive impairment. Coexisting pathological changes, often vascular, may lower the burden of Alzheimer's-type pathological features that are required to produce dementia and thus are potential confounders in an analysis of

**Appendix Page 29**

interactions between Alzheimer's-type pathological changes and age. However, a recent analysis of a smaller cohort, which was not representative of a population and which excluded those with any vascular disease in the brain, also showed an attenuated association between Alzheimer's-type pathological features and dementia in the oldest persons. To date, there is no protocol that has been widely validated and made operational that can score the diversity of vascular pathology encountered in the aging brain. Without such a protocol, analysis of the interaction between Alzheimer's-type and vascular pathological features remains limited.

The exponential relationship between age and the prevalence of dementia, combined with the increasing number of people surviving into old age, is driving the prevalence of dementia upward in the oldest old age groups. The CFAS, as a population-based study, can examine the implications of this increase. The study shows that the relationship between neuropathological indexes and dementia changes with age and that this change needs to be taken into account in models of dementia. Current disease-based classifications are based on discrete entities, such as Alzheimer's disease, vascular dementia, or mixed dementia. Our and other findings suggest this is a simplification and that the pathological basis of dementia should be considered as an interaction among pathological changes, compensatory mechanisms, and underlying synaptic dysfunction. Cognitive dysfunction in later life is a life-span issue and is affected by genetic, developmental, and lifestyle factors, accumulated neural insults, innate and acquired cerebral reserve and compensatory mechanisms, and age-related decline. The diverse interplay of these factors must account for the variation in cognitive outcome that is observed among individual persons for particular pathological changes in the brain that are associated with age. This holistic view offers the opportunity to explore diverse factors that underlie dementia and suggests that therapeutic interventions based solely on studies in younger cohorts in the context of the classic view of Alzheimer's disease will be less effective in the oldest old. Age cannot be neglected if the effect of dementia on the population is to be addressed and the most effective strategies are to be developed.

Supported by a grant (G9901400) from the Medical Research Council, United Kingdom.    No potential conflict of interest relevant to this article was reported. Drs. Savva and Wharton contributed equally to this article.    We thank the respondents, their families, and their family physicians for all their help in the study and particularly for agreement to participate in the brain-donation program.

**Appendix Page 30**

**Source Information:**  From the Department of Public Health and Primary Care, Institute of Public Health, University of Cambridge, Cambridge (G.M.S., C.B.); the Academic Unit of Pathology, University of Sheffield, Sheffield (S.B.W., P.G.I., G.F.); and the Medical Research Council Biostatistics Unit, Institute of Public Health, Cambridge (F.E.M.) — all in the United Kingdom.

```
                                2000 GENERAL ELECTION                          February 21, 2001
                                  CITY OF NEW YORK                             PAGE:     1

                               STATEMENT   AND   RETURN
                             OF THE VOTES FOR THE OFFICE OF
                             PRESIDENT AND VICE PRESIDENT
                                OF THE UNITED STATES

                                                        NO. OF CANDIDATES TO BE ELECTED:   1

     CITY OF NEW YORK                                    R E C A P I T U L A T I O N
```

| | | | | | | | REPUBLICAN | DEMOCRATIC | INDEPENDENCE | CONSERVATIVE | LIBERAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | ABS/ | | | VALID | TOTAL VOTE | 1A | 1B | 1C | 1D | 1E |
| | PUBLIC | MIL | FED | EMERG | AFFID | THIS | G W BUSH | A GORE | J HAGELIN | G W BUSH | A GORE |
| COUNTIES | COUNTER | BALLOT | BALLOT | BALLOT | BALLOT | OFFICE | D CHENEY | J LIEBERMAN | N GOLDHABER | D CHENEY | J LIEBERMAN |
| NEW YORK | 542124 | 28312 | 2005 | 4046 | 20232 * | 596750 * | 79487 | 432815 | 861 | 2626 | 7792 |
| BRONX | 299124 | 5914 | 548 | 1551 | 15769 * | 323291 * | 33224 | 256322 | 536 | 3021 | 4294 |
| KINGS | 592135 | 13631 | 1158 | 13018 | 22621 * | 642563 * | 90366 | 472399 | 897 | 6243 | 7736 |
| QUEENS | 545483 | 13460 | 1415 | 1765 | 13427 * | 576132 * | 113528 | 401067 | 721 | 8524 | 8311 |
| RICHMOND | 135116 | 4469 | 72 | 337 | 4505 * | 144525 * | 59187 | 70922 | 154 | 4716 | 1253 |
| | | | | | * | * | | | | | |
| TOTAL | 2113982 | 65786 | 5198 | 20717 | 76554 * | 2283261 * | 375792 | 1633525 | 3169 | 25130 | 29386 |

```
     WE CERTIFY THIS STATEMENT TO BE CORRECT, AND HAVE CAUSED THE SAME
     TO BE ATTESTED BY THE SIGNATURES OF THE MEMBERS OF THIS BOARD, OR
     A MAJORITY THEREOF, ON THIS 21ST DAY OF February, 2001


     ................................    .................................
                    SECRETARY                          CHAIRMAN

                                          .................................


                                          .................................
                                                CANVASSING BOARD
```

Appendix Page 32

2000  GENERAL  ELECTION
CITY OF NEW YORK

STATEMENT  AND  RETURN
OF THE VOTES FOR THE OFFICE OF
PRESIDENT AND VICE PRESIDENT
OF THE UNITED STATES

February 21, 2001
PAGE:    1A

NO. OF CANDIDATES TO BE ELECTED:  1.

CITY OF NEW YORK

| COUNTIES | RIGHT TO LIFE 1F P BUCHANAN E FOSTER | GREEN PARTY 1G R NADER W LA DUKE | WORKING FAMILIES 1H A GORE J LIEBERMAN | BUCHANAN REFORM 1I P BUCHANAN E FOSTER | CONSTITUTION 1J H PHILLIPS J FRAZIER | LIBERTARIAN 1K H BROWNE A OLIVER | SOCIALIST WORKERS 1L J E HARRIS M TROWE | SCAT VOTE | UNRE CORD VOTE |
|---|---|---|---|---|---|---|---|---|---|
| NEW YORK | 756 | 31172 | 13916 | 253 | 76 | 1004 | 174 | 74 | 25744 |
| BRONX | 694 | 4265 | 5185 | 227 | 54 | 117 | 109 | 15 | 15228 |
| KINGS | 983 | 20058 | 17378 | 416 | 142 | 420 | 145 | 54 | 25326 |
| QUEENS | 1544 | 13720 | 7589 | 345 | 87 | 385 | 109 | 61 | 20141 |
| RICHMOND | 500 | 3550 | 1653 | 53 | 17 | 96 | 20 | 8 | 2396 |
| TOTAL | 4477 | 72765 | 45721 | 1294 | 376 | 2022 | 557 | 212 | 88835 |

Appendix Page 33

BOE - About NYC Board of Elections                                     http://vote.nyc.ny.us/html/about/about.shtml

Español | 繁體中文 | 한국어 | বাংলা | Русский


**CITY OF NEW YORK**

A A

## Home

**About NYC Board of Elections**

Mission Statement
Commissioners & Management
Commissioners' Minutes
Commissioners Meeting Agendas
Live Meetings & Hearings
Video Archive
Personnel Guidelines

**For Voters**

**Mark It, Scan It, Vote!**

**For Poll Workers**

**For Candidates**

**Election Dates**

**Certified Election Results**

**News**

**Publications & Forms**

**Requests for Information**

**Employment Opportunities**

**Contact NYC Board of Elections**

 Fan us on Facebook
Follow us on Twitter
Follow us on Instagram
Watch us on Youtube

Get ADOBE® READER®

### ABOUT NYC BOARD OF ELECTIONS

The Board of Elections in the City of New York is an administrative body of ten Commissioners, two from each borough upon recommendation by both political parties and then appointed by the City Council for a term of four years. The Commissioners appoint a bipartisan staff to oversee the daily activities of its main and five borough offices.

The Board is responsible under New York State Election Law for the following:

- Voter registration, outreach and processing
- Maintain and update voter records
- Processing and verification of candidate petitions/documents
- Campaign finance disclosures of candidates and campaign committees
- Recruiting, training and assigning the various Election Day officers to conduct elections
- Operate poll site locations
- Maintain, repair, setup and deploy the Election Day operation equipment
- Ensure each voter their right to vote at the polls or by absentee ballot
- Canvassing and certification of the vote
- Voter education, notification and dissemination of election information
- Preparation of maps of various political subdivisions.


ID COMMISHIONERS

**Appendix Page 34**

© Copyright 2014 All Rights Reserved

Contact Us

## Commissioners

- Peter S. Kosinski / Co-Chair
- Douglas A. Kellner / Co-Chair
- Andrew J. Spano / Commissioner
- Gregory P. Peterson / Commissioner

4 COMMISSIONERS

## Executive Directors

- Todd D. Valentine / Co-Executive Director
- Robert A. Brehm / Co-Executive Director

## Mission Statement

The State Board of Elections was established in the Executive Department June 1, 1974 as a bipartisan agency vested with the responsibility for administration and enforcement of all laws relating to elections in New York State. The Board is also responsible for regulating disclosure and limitations of a Fair Campaign Code intended to govern campaign practices. In conducting these wide-ranging responsibilities, the Board offers assistance to local election boards and investigates complaints of possible statutory violations. In addition to the regulatory and enforcement responsibilities the board is charged with the preservation of citizen confidence in the democratic process and enhancement in voter participation in elections.

**Appendix Page 35**



**NEW YORK STATE** | **Board of Elections**

## CALENDAR FOR THE
## <u>APRIL 19, 2016</u>

PRESIDENTIAL
PRIMARY ELECTION
for
SELECTING DELEGATES
to a
NATIONAL CONVENTION

Requirements and dates herein are
provided for in Chapters 87 and 88
of
the Laws of 2015

40 North Pearl Street, Suite 5
Albany, New York  12207
(518) 474-6220
<u>www.elections.ny.gov</u>

August  18, 2015

Appendix Page 36

## DELEGATE SELECTION PLAN

Pursuant to Chapters 87 and 88 of the Laws of 2015, a state committee providing for the selection of delegates and alternate delegates to a national party convention or conference must select either the §3 plan or the §4 plan contained in the act.

| | |
|---|---|
| 12/1/15 | Last day for other political parties to choose Republican plan. *§2-122-b(1)* |
| 11/1/15 | Last day for a party to select their delegate selection method. *§2 Chapter 87 of Laws of 2015* |

## FILING REQUIREMENTS § 1-206(1)(a)

For the 2016 Federal Primary Election and General Election, all certificates and petitions of designation or nomination, certificates of acceptance or declination of such designations and nominations, certificates of authorization for such designations, certificates of disqualification, certificates of substitution for such designations or nominations and objections and specifications of objections to such certificates and petitions required to be filed with the State Board of Elections or a board of elections outside of the city of New York shall be deemed timely filed and accepted for filing if sent by mail or overnight delivery service (as defined in CPLR §2103(b)(6)) in an envelope postmarked or showing receipt by the overnight delivery service prior to midnight of the last day of filing, and received no later than one business day after the last day to file such certificates, petitions, objections or specifications.

## REPUBLICAN DELEGATE SELECTION PLAN FILING DATES

| | |
|---|---|
| 1/26/16 - 2/16/16 | Dates for nationally-known candidates or matching fund eligible candidates to file certificate with State Board requesting to appear on ballot. *§2-122-b(3)(a-b)* |
| 2/24/16 | Last day for SBOE to certify nationally-known or matching fund candidates. *§2-122-b(3)(b)* |
| 3/22/16 | Last day for presidential candidate to file certificate to have their name removed from the primary ballot. *§2-122-b(3)(d)* |
| 4/18/16 | Last day for presidential candidate to file certificate deeming any vote for such candidate to be a void vote. *§2-122-b(3)(d)* |

Appendix Page 37

## DEMOCRATIC DELEGATE SELECTION PLAN FILING DATES

| | |
|---|---|
| 2/8/16 | Last day for candidates to decline designations. *§2-122-a(2)* |
| 2/8/16 | Last day for CBOE to notify SBOE of candidates which filed at CBOE. *§2-122-a(6)(fi)* |
| 2/16/16 | Last day for party committee to file certificate of candidacies for delegate and alternate delegate candidates. *§2-122-a(7)(a-b)* |
| 2/25/16 | Last day for SBOE to notify party committee of candidates who will appear on ballot. *§2-122-a(7)(d)* |
| 2/26/16 | Last day for CBOEs to notify party committee of candidates who will appear on ballot. *§2-122-a(7)(d)* |

## THE FOLLOWING DATES APPLY TO ALL DELEGATE SELECTION PLANS

## DESIGNATING PETITIONS

| | |
|---|---|
| 12/29/15 | First day for signing designating petitions. *§6-134 (4)* |
| 2/1/16 - 2/4/16 | Dates for filing designating petitions. *§6-158 (1)(a)* |
| 2/8/16 | Last day to decline a designation. *§6-158 (2)* |
| 2/12/16 | Last day to fill vacancy after declination. *§6-158 (3)* |

## CERTIFICATION

| | |
|---|---|
| 2/25/16 | Certification of Primary ballot by SBOE of designations filed in its office. *§4-110* |
| 2/26/16 | Certification of Primary ballot by CBOE of designations filed locally. *§4-114* |

## REGISTRATION FOR PRESIDENTIAL PRIMARY ELECTION

| | |
|---|---|
| 3/25/16 | Mail Registration: Last day to postmark application and last day it must be received by board of elections is March 30. *§5-210 (3)* |
| 3/25/16 | In Person Registration: Last day application must be received by board of elections to be eligible to vote in primary election. *§§5-210, 5-211 & 5-212* |
| 3/30/16 | Change of address. *§5-208 (3)* |

## ABSENTEE VOTING FOR PRESIDENTIAL PRIMARY ELECTION

| | |
|---|---|
| 4/12/16 | Last day to postmark application for ballot. *§8-400 (2)(c)* |
| 4/18/16 | Last day to apply in person for ballot. *§8-400 (2)(c)* |
| 4/18/16 | Last day to postmark ballot and date it must be received by the board of elections is April 26. *§8-412 (1)* |
| 4/19/16 | Last day to deliver ballot in person to county board. *§8-412 (1)* |

## MILITARY/SPECIAL FEDERAL VOTERS FOR PRESIDENTIAL PRIMARY ELECTION

| | |
|---|---|
| 3/25/16 | Last day for a BOE to receive application for ballot if not previously registered. *§10-106 (5) & §11-202 (1)(a)* |
| 4/12/16 | Last day for a BOE to receive application if previously registered. *§10-106 (5) & §11-202(1)(b).* |
| 4/18/16 | Last day to apply personally if previously registered. *§10-106 (5)* |
| 3/5/16 | Date for county boards to transmit Military/Special Federal ballots. *§10-108 (1) & §11-204* |
| 4/18/16 | Last day to postmark ballot and date it must be received by the board of elections is April 26. *§10-114(1) & §11-212* |

**FDNY: Teamwork is a Family Matter!    The Landlord and Lawyer from Hell!**
**Recuperating in a Five Star Hospital    Progressive? What Does It Mean?**

Volume V Issue I                    Saturday November 4, 2017                    **FREE** - Paid for by Ads & Subscriptions



# DeWitt Clinton Express
## A Neighborhood Newspaper



*Serving the Neighborhood of Hell's Kitchen and the Rest of America!*



# The Hockey Player vs. the Figure Skater!



# DeWitt Clinton Express
## Special General Election



## Actors, Consultants and Politicians

This article is about the comparison of the different types of actors and their consultants. The 2 types of actors to be compared are movie stars and politicians.

We all know that actors have language, voice, singing and perhaps dancing coaches. They also have coaches who assist them in being able to read, remember and to project their lines. The ultimate "coach" is the director who directs the actor to say and what to do, where and when. Let's group all of these coaches under the heading of consultants and voila!

Can you tell the difference between the actors who are movie stars and those who are politicians?

The politician have their political consultants who tell them what to say based upon polling or public opinion. There are the media consultants who tell them how to behave, how to stand and how to address the public at press conferences. They are similar to the acting coaches the movie stars use.

All of this struck me like a bolt of lightning one day when attending a candidates forum held by a number of east side democratic clubs. It was the behavior of Bill DeBlasio that did it.

and phony.

Those media experts of him do plenty for him as well. They have him posing as this godly person, the cameras often are pointed up at him and he looking down his nose on us poor old New Yorkers. It's his arrogance showing its ugliness just as the arrogance of another person from Massachusetts shows his on a daily basis. His name is Mayor Michael Bloomberg!

The fact that DeBlasio is also from Massachusetts or from anywhere else in the United States and is NOT native New Yorker is the best reason not to vote for him.

DeBlasio's connection to one of the Royal Families of the Democratic Party - the Clintons - make it far more suspicious as is being backed by them for mayor. After all, Hillary Clinton is the expert at make overs, physical and other wise. Look at the photos below and see the transformations of Hillary Clinton over the course of a very long time and decide for yourself. BTW, DeBlasio was Clinton's Campaign Manager.

Now that we are finished with the makeover of Mr.

ask me.

Regarding the glasses Lhota wears, they are much more acceptable than the rimmed glasses he wore while in college. His beard was much fuller then which with the combination of the glasses worn and his beard in college made him look like a professor or a learned man.

His current beard and behavior may be being used to elicit the "New Yawkers" to vote for him but it is not working for me. He's nothing but a thug as was his former boss Rudolph Giuliani who lost 27 First Amendment cases while in office.

Since I sued the Giuliani administration over the illegal and immoral privatization of our local park and put a wrench in Giuliani's plans to privatize local parks, Lhota held a grudge that turned into an almost embarrassing moment. Lhota frequented a restaurant that a friend of mine owned and he became angered at my friend for being friendly with me.

Lhota, just like Giuliani's former police commissioner Bernard Kerik who was put in prison for some of his misdeeds, is no better.







**?** What will Hillary Clinton look like in her campaign for U.S. President?

Good Ole Bubba AKA "Slick Willy" looks pretty much the same. It is a testament for the changes in her "book cover" from college, to presidential campaign, to U.S. Senator to presidential candidate to the end of the line as U.S. Secretary of State that Hillary Clinton's ability to change with the times is to be applauded.

There I was sitting in the audience when he came to the podium and the first thing he did was to introduce his wife, who is Black and formerly Gay. I thought "Great. He's pandering to the Black and Gay Community at the same time" and then he began to speak. For some odd reason, images of Abraham Lincoln and George Washington came to mind as all three are taller than most. But more obvious to me were the stances of Lincoln and Washington that are very familiar to me because of research conducted two years ago looking for images of both Lincoln and Washington for use in a music video that was released under the Phoenix Bird Rising Project.

Shortly after the candidate's forum I decided to conduct a bit more research into the issue of "judging a book by its cover" and discovered some interesting information.

The fact that Bill DeBlasio is taller than everyone else helped him win the primary. However he needed help from Anthony Weiner who was used as the democratic party's attack dog. It was a role Weiner played well as he could only play the role of a loyal soldier to his party. After all the man is politically astute enough to know he could never get elected as mayor of the city with all he's done and with the additional info that was unearthed during his campaign. But let's get back to the DeBlasio makeover of which some is shown on the front page of this issue.

I am not going to hand feed you on this one so you will have to do a little leg work yourself by Googling for Bill DeBlasio images.

Early on in his career and initial he decided to run for mayor, DeBlasio wore a beard of sorts, which by all means did not make him sexy and or attractive. However, a clean shaven, well groomed, tall, dark and handsome man who towers over practically everyone, who also had some dental work done in the upper front of his mouth is a major improvement. The dental work makes him look a bit different when he smiles that smile of his that seems to be so contrived

DeBlasio or whatever his name is, let's take a look at Joe Lhota. I never trust a politician who when extending his arm using a fist covered by a thumb when making a point. It's overdone method-acting if you



The image above is known as the Hudson Yards. It is in the process of being developed. Two carriage horse stables are "standing in the way of progress" and the politicians will do anything to get their hands on that valuable property, legally or otherwise. The MTA also has its hands in the largest development project in the universe.



**WARNING** PLUGGING YOUR EARS WONT CHANGE THE TRUTH

Just before the 911 attacks on the World Trade Center, and with the assistance of Christine Quinn who was only a council member at the time, helped two of Giuliani's contributors to his re-election campaign to be awarded air rights. They simply ignored the fact there were serious environmental hazards as was the safety of the tenants. If you want proof, watch "The Mighty Quinn Chose Environmental Hazard Over Safety of Tenants" at www.vimeo.com/72864480.

The Independence Party Candidate for Mayor Adolfo Carrion also voted in favor of the environmental hazards. Joe Lhota was Deputy Mayor of Operations for Giuliani at the time.

That's part of the story about Joe Lhota and how he helped make affordable housing a reality in New York City as he likes to brag. His bravado as former chair of the MTA is getting him into trouble as well.

He claims he is a successful business man but what has he done to prove it? By instituting a tax on all who take a taxicab ride in New York City? A tax that goes directly to the MTA?

It must be admitted to that the extra dollar charged for every new transit card is brilliant! I am being sarcastic of course, as millions and millions of dollars are taken out of the pockets of tourists and everyday users of the transit system in the city.

The brilliance of his decision to create a reduced fare card for those who are qualified is another brilliant feat. It's too bad that they did not make the reduced fare cards refillable and with increased amounts able to be added. You have to toss them out after the two fares are used.

It's also too bad that he did not eliminate the unit of the MTA that provides qualified persons the "official" reduced fare cards because when the token booth attendant began to provide the reduced fare cards, the unit providing the official ones was no longer needed. It is also not necessary to provide the personal information like your SSN to the MTA for a reduced fare card.

**Appendix Page 39**

**Image of NBC Channel 4 News showing the name of Bill Murawski is on the Ballot for Mayor of New York City.**



FREDERIC M. UMANE
PRESIDENT

ROSANNA VARGAS
SECRETARY

JOSE MIGUEL ARAUJO
JOHN FLATEAU, PH. D.
MARIA R. GUASTELLA
MICHAEL MICHEL
ALAN SCHULKIN
SIMON SHAMOUN
ROBERT SIANO
JOHN Wm. ZACCONE
COMMISSIONERS

MICHAEL J. RYAN
EXECUTIVE DIRECTOR

DAWN SANDOW
DEPUTY EXECUTIVE DIRECTOR

PAMELA GREEN PERKINS
ADMINISTRATIVE MANAGER

GEORGEA KONTZAMANIS
OPERATIONS MANAGER

## BOARD OF ELECTIONS
IN
THE CITY OF NEW YORK
EXECUTIVE OFFICE, 32 BROADWAY
NEW YORK, NY 10004-1609
(212) 487-5300
www.vote.nyc.ny.us

**Bill Murawski**
**530 West 50 Street, #5A**
**New York, NY 10019**

July 17, 2017

Dear Candidate:

Under the Voting Rights Act, the Board of Elections in the City of New York is required to print the candidate's name in Chinese on all paper ballots in designated election districts in Manhattan, Brooklyn and Queens. For this year's election(s) your name may be translated.

**Please review the Chinese transliteration of your name below:**

- If you prefer a different transliteration from that listed, please indicate it in the space provided. Sign, date and mail back or fax your changes (if any) within seven (7) days of the postmark of this letter. If you FAX your changes within the seven (7) days, you still must mail the original to the Board of Elections. If your change is not received by that date, the Board will use its transliteration printed below for the ballot printing.

- If you approve of the transliteration provided, take no action. However, if you have any questions, you may contact the Board's Translators below at (212) 487-5503 or (212)-487-5501. Our fax number is (212) 487-5347. Thank you for your full cooperation.

TRANSLITERATION OF CANDIDATE'S
NAME:

OFFICE(S) / DISTRICT(S):

Bill Murawski

比爾

穆拉斯基

| English Ballot Name | Office Title | Political District |
|---|---|---|
| Bill Murawski | Mayor | Citywide |

PROPOSED VERSION BY CANDIDATE (IF ANY):

CANDIDATE'S SIGNATURE & DATE APPROVED

Shirley Lee & Judy Lei
Chinese Translator

**Appendix Page 41**

FREDERIC M. UMANE
PRESIDENT

ROSANNA VARGAS
SECRETARY

JOSE MIGUEL ARAUJO
JOHN FLATEAU, PH. D.
MARIA R. GUASTELLA
MICHAEL MICHEL
ALAN SCHULKIN
SIMON SHAMOUN
ROBERT SIANO
JOHN Wm. ZACCONE
COMMISSIONERS



# BOARD OF ELECTIONS
IN
THE CITY OF NEW YORK
EXECUTIVE OFFICE, 32 BROADWAY
NEW YORK, NY 10004-1609
(212) 487-5300
www.vote.nyc.ny.us

MICHAEL J. RYAN
EXECUTIVE DIRECTOR

DAWN SANDOW
DEPUTY EXECUTIVE DIRECTOR

PAMELA GREEN PERKINS
ADMINISTRATIVE MANAGER

GEORGEA KONTZAMANIS
OPERATIONS MANAGER

**Bill Murawski**
**530 West 50 Street**                                July 14, 2017
**New York, NY 10019**

Dear Candidate:

Under the Voting Rights Act, the Board of Elections in the City of New York is required to print the candidate's name in Bengali in designated election districts in Queens. For this year's election(s) your name may be translated.

**Please review the Bengali transliteration of your name below:**

- If you prefer a different transliteration from that listed, please indicate it in the space provided. Sign, date and mail back or fax your changes (if any) within seven (7) days of the postmark of this letter.If you FAX your changes within the seven (7) days, you still must mail the original to the Board of Elections. If your change is not received by that date, the Board will use its transliteration printed below for the ballot printing.

- If you approve of the transliteration provided, take no action.  However, if you have any questions, you may contact the Board's Translators below at (212) 487-5413 or (212) 487-5415.  Our fax number is (212) 487-5347. Thank you for your full cooperation.

TRANSLITERATION OF CANDIDATE'S
NAME:

OFFICE(S) / DISTRICT(S):

> Bill Murawski
> বিল
> মুরাওস্কী

| English Ballot Name | Office Title | Political District |
|---|---|---|
| Bill Murawski | Mayor | Citywide |

PROPOSED VERSION BY CANDIDATE (IF ANY):

_____
CANDIDATE'S SIGNATURE & DATE APPROVED

Shamsul Haque & Masud Masum
Bengali Translators

**Appendix Page 42**

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

CAPTION:

WILLIAM MURAWSKI, BETTER KNOWN AS BILL MURAWSKI, AND ALL OTHERS SIMILARLY SITUATED

v.

NYS, NYC BOARDS OF ELECTION ET AL

**CERTIFICATE OF SERVICE***

Docket Number: _17 CV6859_

I, _EVELYN HAMMER_, hereby certify under penalty of perjury that
(print name)

on _NOVEMBER 6, 2017_, I served a copy of _A WRIT OF_
(date)
_MANDAMUS_

(list all documents)

by (select all applicable)**

_✓_ Personal Delivery          ___ United States Mail          ___ Federal Express or other
                                                                    Overnight Courier

___ Commercial Carrier          ___ E-Mail (on consent)

on the following parties:

ATTN: JAMES M. DERWIN
(1) ZACHARY W. CARTER; CORPORATION COUNSEL, CITY of NY.

| Name | Address | City | State | Zip Code |
|------|---------|------|-------|----------|
| (2) ERIC T. SCHNEIDERMAN; | | (100 CHURCH St | NYC | NY |
| Name | Address | City | State | Zip Code |
| NYS ATTORNEY GENERAL; ATTN: OWEN T. CONROY | | 120 BROADWAY; | NY | 10271 |
| Name | Address | City | State | Zip Code |
| (3) FED DIST JUDGE SWEET; DANIEL PATRICK MOYNAHAN US | | US COURT HOUSE; | 500 PEARL ST | |
| Name | Address | City NY, NY 10007-1312 | State | Zip Code |

*A party must serve a copy of each paper on the other parties, or their counsel, to the appeal or
proceeding. The Court will reject papers for filing if a certificate of service is not simultaneously
filed.

**If different methods of service have been used on different parties, please complete a separate
certificate of service for each party.

_NOVEMBER 6, 2017_
Today's Date

_[signature]_
Signature

Certificate of Service Form (Last Revised 12/2015)

# UNITED STATES DISTRICT COURT
for the

~~SOUTHERN~~ ~~DISTRICT OF~~ ~~NEW YORK~~

## SECOND CIRCUIT U.S. COURT OF APPEALS

WILLIAM MURAWSKI, better known
as BILL MURAWSKI AND ALL OTHER
CANDIDATES similarly situated
PLAINTIFFS)
                    Plaintiff

v.                                      Case No. 17 CV 6859

NY STATE BOARD OF ELECTIONS,
NY CITY BOARD OF ELECTIONS
AND THE NY CITY CAMPAIGN
FINANCE BOARD      AS DEFENDANTS
                    Defendant

## AFFIDAVIT ACCOMPANYING MOTION
### FOR PERMISSION TO APPEAL IN FORMA PAUPERIS

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.) | Complete all questions in this application and then sign it. Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number. |

Signed: _William Murawski_    Date: _11/1/2017_

My issues on appeal are: VIOLATIONS OF 1st 5th + 14th AMENDMENT
AND PLAIN IGNORANCE OF REQUESTED TRO'S
OF JUDGE SWEET, VIOLATION OF AMERICANS W
DISABILITIES ACT OF 1990

1.  *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | Spouse | You | Spouse |
| Employment | $ ∅ | $ | $ ∅ | $ |
| Self-employment | $ ∅ | $ | $ ∅ | $ |
| Income from real property (such as rental income) | $ ∅ | $ | $ ∅ | $ |
| Interest and dividends | $ ∅ | $ | $ ∅ | $ |
| Gifts | $ ∅ | $ | $ ∅ | $ |
| Alimony | $ ∅ | $ | $ ∅ | $ |
| Child support | $ ∅ | $ | $ ∅ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ ∅ | $ | $ ∅ | $ |
| Unemployment payments | $ ∅ | $ | $ ∅ | $ |
| Public-assistance (such as welfare) | $ ∅ | $ | $ ∅ | $ |
| Other (specify): | $ ∅ | $ | $ ∅ | $ |
| **Total monthly income:** | $ | $ | $ | $ |

2.    *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| N/A | N/A | N/A | $ |
| | | | $ |
| | | | $ |

3.    *List your spouse's employment history for the past two years, most recent employer first.*
      *(Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|----------|---------|---------------------|-------------------|
| N/A | N/A | N/A | $ |
|  |  |  | $ |
|  |  |  | $ |

4.    *How much cash do you and your spouse have?* $ 0

      *Below, state any money you or your spouse have in bank accounts or in any other*
      *financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|-----------------------|-----------------|-----------------|------------------------|
| N/A |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

*If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must*
*attach a statement certified by the appropriate institutional officer showing all receipts,*
*expenditures, and balances during the last six months in your institutional accounts. If you*
*have multiple accounts, perhaps because you have been in multiple institutions, attach one*
*certified statement of each account.*

5.    *List the assets, and their values, which you own or your spouse owns. Do not list clothing*
      *and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 | |
|------|-------------------|------------------|---|
| (Value) $ 0 | (Value) $ 0 | (Value) $ 0 | |
| N/A | N/A | Make and year: | N/A |
|  |  | Model: | N/A |
|  |  | Registration #: | N/A |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ 0 | (Value) $ 0 | (Value) $ 0 |
| Make and year: N/A | | |
| Model: N/A | | |
| Registration #: N/A | | |

6. *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| N/A | $ 0 | $ 0 |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7. *State the persons who rely on you or your spouse for support.*

| Name [or, if under 18, initials only] | Relationship | Age |
|---|---|---|
| N/A | N/A | |
| | | |
| | | |

8.   *Estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>Are real estate taxes included? ☐ Yes ☐ No<br>Is property insurance included? ☐ Yes ☐ No | $ 146 m/o | $ N/A |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ 125 m/o | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ 400 | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ 75 | $ |
| Medical and dental expenses   *SEE ATTACHED* | $ XX | $ |
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ 8500 | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
| Homeowner's or renter's: | $ 0 | $ |
| Life: | $ 0 | $ |
| Health: | $ 0 | $ |
| Motor vehicle: | $ 0 | $ |
| Other: | $ 0 | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ 0 | $ |
| Installment payments | | |
| Motor Vehicle: | $ 0 | $ |
| Credit card (name): | $ 0 | $ |
| Department store (name): | $ 0 | $ |
| Other: | $ 0 | $ N/A |

| | | | |
|---|---|---|---|
| Alimony, maintenance, and support paid to others | $ | | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | | $ |
| Other (specify): | $ | | $ |
| **Total monthly expenses:** | $ $1,346 | | $ |

9. Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?

   ☐ Yes  ☑ No        If yes, describe on an attached sheet.

10. Have you spent - or will you be spending - any money for expenses or attorney fees in connection with this lawsuit?  ☐ Yes  ☑ No

    If yes, how much? $

11. Provide any other information that will help explain why you cannot pay the docket fees for your appeal.

    I AM CURRENTLY CONSIDERED "HOMELESS" BUT THANKS TO THE KINDNESS OF SOME FRIENDS, I AM SAFE AND CARED FOR AFTER A 21 DAY STAY IN THE

12. State the city and state of your legal residence

    PSYCH UNIT OF NYS PRESBYTERIAN CORNELL/WEIL HOSPITAL

    Your daytime phone number: (917) 407-6492

    Your age: 67   Your years of schooling: HIGH SCHOOL GRADUATE; COMPUTER TECHNOLOGY CERTIFICATE (10 MOS)

    Last four digits of your social-security number: 8107

    See letter from MY ATTY TO LANDLORDS ATTACHED REGARDING AN ILLEGAL LOCKOUT.

① I WILL OWE HUNDREDS OF THOUSANDS
OF DOLLARS AS A RESULT OF A
RECENT HOSPITAL STAY OF 21 DAYS
IN THE BURN UNIT OF NY. PRESBYTERIAN
SEE ATTACHED

② I HAVE A DENTIST BILL OF $1,700

③ I HAVE A BILL FOR CARDIOVACULAR
ASSOC FOR $350

④ I HAVE A PHYSICAL THERAPIST BILL
FOR $350.

# New York-Presbyterian
## Weill Cornell Medical Center
### 525 East 68th Street • New York, NY 10065

## EXITCARE® PATIENT INFORMATION

Patient Name: <u>WILLIAM MARAWSKI</u>
Attending Caregiver: <u>Bessey, Palmer</u>

# Excuse from Work, School, or Physical Activity

<u>WILLIAM MARAWSKI</u> needs to be excused from:

☑ Work

☑ School

☑ Physical activity

Beginning 09/29/2017 and through the following date: <u>10/17/2017</u> while being treated as an inpatient.

Caregiver's signature: _____    Maria Dominguez, MD

Date: October 16, 2017

Document Released: 6/13/2002 Document Revised: 3/11/2013 Document Reviewed: 7/20/2015
ExitCare® Patient Information ©2015 ExitCare, LLC. This information is not intended to replace advice given to you by your health care provider. Make sure you discuss any questions you have with your health care provider.

2017-057-02165

**Appendix Page 14**